United States District Court
Southern District of Texas
FILED

MAY 1 5 2002

Michael N Milby Clerk

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
McALLEN DIVISION

MISCELLANEOUS
M-02-023

UNITED STATES OF AMERICA )
)
v.                       )        CRIMINAL NO. M-00-439
)
JOSE MARIO TELLEZ        )
_____)

## AFFIDAVIT IN SUPPORT OF A REQUEST FOR EXTRADITION

I, Patricia Cook Profit, being duly sworn, depose and state:

1. I am a citizen of the United States, residing in McAllen, Texas.

2. In June 1977, I received a Juris Doctor degree from New England School of Law in Boston, Massachusetts and was admitted to the Bar of the State of Massachusetts in 1977 and the Federal District Court of Massachusetts in 1979. From 1977 to 1979, I was employed as an attorney with private law firms in the Boston area. From 1979 until 1987, I was employed as an attorney/advisor with the United States Department of Housing and Urban Development. From 1987 to 1988 I was employed with a private practice firm in Charlestown, Massachusetts. From March of 1988 until August of 1999 I was employed as an attorney with the United States Department of Justice in Washington, D.C.

3. From August 1999 to the present, I have been employed as an Assistant United States Attorney in the United States Attorney's Office for the Southern District of Texas. As an

Assistant United States Attorney, my duties are to prosecute persons charged with criminal violations of the laws of the United States.  Since I became an Assistant United States Attorney in August of 1999, I have personally represented the United States in cases against over two hundred and six defendants charged with violations of federal criminal laws, including nine criminal trials.  Based upon my training and experience, I am an expert in the criminal laws and procedures of this district and the United States.

4.  During my tenure in the United States Attorney's Office, I have become particularly knowledgeable in that area of criminal law relating to violations of the federal narcotics statutes, including:  Title 21, United States Code, Section 846, conspiracy to possess with intent to distribute a controlled substance; Title 21, United States Code, Section 841(a)(1), possession with intent to distribute a controlled substance; Title 18, United States Code, Section 2, aiding, abetting, counseling, commanding, inducing, procuring or causing the commission of an offense against the United States; Title 18, United States Code, Section 1956(h), conspiracy to 1) conduct or attempt to conduct financial transactions affecting interstate commerce which transaction involves the proceeds of the specified unlawful activity of distribution of controlled substances a) with the intent to carry on the specified unlawful activity, and b) knowing that the

transaction was designed to conceal and disguise the nature, source, location, ownership and control of the proceeds, and 2) knowingly to transport, transmit, transfer, or attempt the same, a monetary instrument and funds from a place inside the United States to a place outside the United States with the intent to carry on the specified unlawful activity (distribution of a controlled substance), and Title 18, United States Code, Section 1956(a)(1)(A)(I), conducting a financial transaction involving the proceeds of a specified unlawful activity, knowing that the property involved in the financial transaction was the proceeds of an unlawful activity.

5.   In the course of my official duties I have become familiar with the charges and evidence in the case against Jose Mario Tellez,(hereinafter Tellez) entitled <u>United States v. Jose Mario Tellez, et al.</u>, Criminal No. M-00-439, which arose out of an investigation into an organization responsible for the distribution of multi-kilograms of cocaine and marijuana in the United States.

6.   Under the laws of the United States, a criminal prosecution may be commenced by a grand jury on its own decision to return and file an indictment with the Clerk of the United States District Court.  A grand jury is composed of not less than sixteen (16) people whom the United States District Court selects at random from the residents of the Southern District of Texas.

The grand jury is part of the judicial branch of the Government. The purpose of the grand jury is to view the evidence of crimes presented to it by the United States law enforcement authorities. After independently viewing this evidence, each member of the grand jury must determine if there is probable cause to believe that a crime has been committed and that the particular defendant or defendants committed the crime.  After at least twelve (12) jurors affirmatively vote that the defendant committed the crime or crimes, the grand jury may return an indictment.  An indictment is a formal document that charges the defendant with a crime or crimes, describes the specific laws which the defendant is accused of violating and describes the acts of the defendant that are alleged to be violations of the law.  After the grand jury returns the indictment, a warrant for the defendant or defendants' arrest is issued at the discretion of a United States District Court Judge or Magistrate Judge.

### THE CHARGES AND PERTINENT UNITED STATES LAW

7.  On August 29, 2000, a federal grand jury sitting in the Southern District of Texas, Brownsville Division,  returned and filed an indictment against Jose Mario Tellez, charging him with: (1) one count of conspiracy to possess with intent to distribute cocaine, in violation of Title 21, United States Code, Sections 846 and 841(a)(1)( Cocaine is a Schedule II controlled substance under Title 21, United States Code, Section 812.); (2) one count

4

of conspiracy to possess with intent to distribute marijuana, in violation of Title 21, United States Code, Sections 846 and 841(a)(1) (Marijuana is a Schedule I controlled substance under Title 21, United States Code, Section 812) ;(3) one count conspiracy to engage in money laundering, in violation of Title 18, United States Code, Sections 1956(a)(1)(A)(I), 1956(a)(2)(A)(I), and 1956(h);(4) one substantive count possession with intent to distribute cocaine, in violation of Title 21, United States Code, Section 841(1)(a),and Title 18, United States Code, Section 2 (5)six substantive counts of possession with intent to distribute marijuana, in violation of Title 21, United States Code, 841(1)(a) and Title 18, United States Code, Section 2 and (6) three substantive counts of money laundering in violation of Title 18, United States Code, Sections 1956 (a)(1)(A).

8. The relevant portions of the statutes cited above are annexed to this affidavit as **Exhibit A.**  Each of these statutes was duly enacted and in force at the time the offenses were committed and at the time the indictment was returned, and they remain in full force and effect.  A violation of any of these statutes constitutes a felony under the laws of the United States.

9.  I have also included as part of **Exhibit A**, the true and accurate text of Title 18, United States Code, Section 3282,

which is the statute of limitations on prosecuting the crimes charged in this indictment.  The statute of limitations merely requires that a defendant be formally charged within five years of the date that the last offense or offenses were committed. Once an indictment has been filed in a federal district court, as with these charges against Tellez, the statute of limitations is tolled and no longer runs.  The reason for this is so that a criminal cannot escape justice by simply hiding out and remaining a fugitive for a long time.

10.   I have thoroughly reviewed the applicable statute of limitations, and the prosecution of the charges in this case is not barred by the statute of limitations.  Since the applicable statute of limitations is five years, and the indictment, which charges criminal violations beginning on or about January of 1995 and **continuing** until the present (i.e., the date of the indictment) was filed in August 2000, the defendant was formally charged within the prescribed five year time period.

11. On August 29, 2000, a warrant for Tellez's arrest was issued by the Honorable Felix Recio, United States Magistrate Judge for the Southern District of Texas, based on the charges filed in the Indictment.

12.   It is the practice of the United States District Court for the Southern District of Texas to retain the original indictment and warrant of arrest and file them with the records

6

of the court.   Therefore, I have obtained certified true and
accurate copies of the indictment and arrest warrant from the
Clerk of the Court and have attached them to this affidavit as
**Exhibit B** and **Exhibit C,** respectively.

13.   Tellez is charged in Count One (1) of the indictment
with knowingly and intentionally conspiring to possess with
intent to distribute cocaine, a controlled substance and in Count
Two (2) of the indictment with knowingly and intentionally
conspiring to possess with intent to distribute marijuana, a
controlled substance.   Under United States law, a conspiracy is
simply an agreement to violate other criminal statutes, in this
instance the laws prohibiting the possession and distribution of
cocaine and marijuana in the United States.   In other words,
under United States law, the act of combining and agreeing with
one or more persons to violate United States law, is a crime in
and of itself.   Such an agreement need not be formal, and may be
simply a verbal understanding.   A conspiracy is deemed to be a
partnership for criminal purposes in which each member or
participant becomes the agent or partner of every other member.
A person may become a member of a conspiracy without full
knowledge of all of the details of the unlawful scheme or the
names and identities of all of the other alleged conspirators.
So, if a defendant has an understanding of the unlawful nature of
a plan and knowingly and willfully joins in that plan on one

7

occasion, that is sufficient to convict him for conspiracy even if he had not participated before and even if he played only a minor part.  In order to convict Tellez of the felony offense charged in Count One (1) of the indictment, and the felony offense charged in Count Two (2) of the indictment, the United States must prove at trial that he came to an agreement with one or more persons to accomplish a common and unlawful plan, as charged in the indictment, and that Tellez knowingly and willfully became a member of such conspiracy.  The maximum penalty for a violation of Title 21, United States Code, Section 846, is a term of life imprisonment, and a fine not to exceed $4,000,000 and a term of supervised release of not less than five (5) years.  While the statutory maximum penalty is life, in actuality Mario Tellez's sentence will be governed by the United States Sentencing Guidelines,(U.S.S.G.) pursuant 18 U.S.C. 3553(a)[1] and 28 U.S.C. 994(a).  Under the sentencing guidelines

--------------------------------

[1]  Title 18 U.S.C. 3553(a) specifically provides in pertinent part that:
    (A) Factors to be considered in imposing a sentence.- The court shall impose a sentence sufficient, **but not greater than necessary**, to comply with the purposes set forth in paragraph (2) of this subsection. The Court in determining the particular sentence to be imposed, shall consider -
    (1) the nature and circumstances of the offenses and the history and characteristics of the defendant;
    (2) the need for the sentence imposed -
        (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
        (B) to afford adequate deterrence to criminal conduct;
        (C) to protect the public from further crimes of the defendant; and

based upon the amount of cocaine that the government can attribute to Tellez, more than 150 kilograms, Tellez's base offense level for Count One of the Indictment is a level 38 (U.S.S.G.§ 2D1.1 - level 38 for over 150 kilograms of cocaine). If Tellez receives a role adjustment as manager or supervisor his guideline range would be increased to a level 41.(U.S.S.G. §3B1.1, Aggravating Role Adjustment).  With a guideline level of 41, and a criminal history category of I, his guideline range of imprisonment is 324 to 405 months (27 years to 33 years, 9 months).  However, if Mario Jose Tellez truthfully admits to his conduct, and accepts responsibility for his misdeeds prior to a trial he is eligible for (depending on timing) either a 2 or 3 level reduction in his base offense level (U.S.S.G. § 3E1.1). Under such a scenario, if he was conscientious, and qualified for a three level reduction, his guideline range would be a level of 38 - 235 to 293 months (19 years, 7 months - 24 years, 5 months.) As to Count Two of the Indictment, the marijuana conspiracy, based upon the amount of marijuana the government can attribute

---

(D) to provide the defendant with needed educational or vocational training, medical care or other correctional treatment in the most effective manner;
(3) the kinds of sentences available;
(4)  the  kinds  of  sentences  and  the  sentencing  range established for -
(A) **the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines issued by the Sentencing Commission pursuant to section 994(a)(1) of Title 28, United States Code, and that are in effect on the date the defendant is sentenced**...(emphasis added.)

to Tellez, the base offense level is a level 34 (U.S.S.G.§ 2D1.1 – at least three thousand but less than 10,000 kilograms of marijuana).  Again with a three level enhancement for his role in the offense as a manager or supervisor (U.S.S.G. §3B1.1, Aggravating Role Adjustment) his base offense level is 37.  With a base offense level of 37, and a criminal history category of one, his sentencing guideline range is 210 to 362 years (17 years,8 months to 30 years, 3 months).  As with Count One, however, if Mario Jose Tellez truthfully admits to his conduct, and accepts responsibility for his misdeeds prior to a trial he is eligible for (depending on timing) either a 2 or 3 level reduction in his base offense level (U.S.S.G.§ 3E1.1).  Under such a scenario, if he was conscientious, and qualified for a three level reduction, his guideline range would be a level of 34, and his guideline sentencing range would be from 151 to 188 months (12 years, 7 months to 15 years, 3 months.)  Thus, under the current sentencing scheme, Mario Tellez is not facing a life sentence.

14.  In Count Three of the indictment, Tellez is charged with unlawfully, willfully and knowingly conspiring to commit certain offenses under Title 18, United States Code, Section 1956, that is, to conduct and attempt to conduct a financial transaction affecting interstate commerce, which transaction involved the proceeds of an unlawful activity, the distribution

of a controlled substance with (a) the intent to promote the carrying on of such specified unlawful activity, and (b) knowing that the transaction was designed to conceal the nature, location, source, ownership and control of the proceeds of the unlawful activity, and knowingly transport or attempt to transport a monetary instrument and funds from a place inside the United States to a place outside the United States with the intent of promoting the specified unlawful activity.  Under United States law, a conspiracy is simply an agreement to violate other criminal statutes, in this instance the laws prohibiting monetary transactions that involve the proceeds of illegal activity with the intent of promoting the unlawful activity ( i.e., money laundering.) In other words, under United States law, the act of combining and agreeing with one or more persons to violate United States law, is a crime in and of itself.  Such an agreement need not be formal, and may be simply a verbal understanding.  A conspiracy is deemed to be a partnership for criminal purposes in which each member or participant becomes the agent or partner of every other member.  A person may become a member of a conspiracy without full knowledge of all of the details of the unlawful scheme or the names and identities of all of the other alleged conspirators.  So, if a defendant has an understanding of the unlawful nature of a plan and knowingly and willfully joins in that plan on one occasion, that is sufficient

11

to convict him for conspiracy even if he had not participated before and even if he played only a minor part. In order to convict Tellez of Count Three of the Indictment, the United States must prove at trial that he came to an agreement with one or more persons to accomplish a common and unlawful plan, as charged in the indictment, and that Tellez knowingly and willfully became a member of such conspiracy.  The maximum penalty for a violation of Title 18, United States Code, Section 1956(h) is imprisonment for not more than twenty (20) years and a fine of not more than $500,000 and a term of supervised release of at least two years but not more than three years.

15.   In Count Six (6) of the indictment, Tellez is charged with knowingly and intentionally possessing with intent to distribute cocaine, a controlled substance.  In order to convict Tellez of the offense charged in Count Six (6) of the indictment, the United States must prove at trial that he knowingly and intentionally possessed a controlled substance, namely cocaine, and that he possessed the controlled substance with the intent to distribute it.  Title 18, United States Code, Section 2, a statute cited in connection with Count Six (6), provides that whoever commands, procures, assists in, or causes the commission of a crime shall be held accountable and punished in the same manner as the principal, or the person who actually carried out the task.  This means that the guilt of Tellez may also be proved

12

even if he did not personally perform every act involved in the commission of the crime charged (possession of cocaine with intent to distribute).  The law recognizes that, ordinarily, anything a person can do for himself may also be accomplished through direction of another person as an agent, or by acting together with, or under the direction of, another person or persons in a joint effort.  So, if the acts or conduct of an agent, employee or other associate of Tellez were willfully directed or authorized by Tellez, or if Tellez aided and abetted another person by willfully joining together with that person in the commission of a crime, then the law holds Tellez responsible for the conduct of that other person just as though Tellez had engaged in such conduct himself.  The maximum penalty for a violation of Section 841(a)(1) of Title 21, United States Code is a term of life imprisonment, and a fine not to exceed $4,000,000 and a term of supervised release of at least five (5) years. However, the guideline analysis that is detailed in paragraph 13 of this Affidavit, applies equally to Count Six as to Count One, so that Tellez will face appreciably less than a life sentence, for the amount of cocaine that the government can prove as to this defendant.

16.  In Counts Nine (9), Ten (10), Fifteen (15), Sixteen (16), Seventeen (17), and Eighteen (18) of the indictment, Tellez is charged with knowingly and intentionally possessing with

intent to distribute marijuana, a controlled substance.  In order

to convict Tellez of the offense charged in Counts Nine, Ten,

Fifteen, Sixteen, Seventeen and Eighteen of the indictment, the

United States must prove at trial that he knowingly and

intentionally possessed a controlled substance, namely marijuana,

and that he possessed the controlled substance with the intent to

distribute it.  Title 18, United States Code, Section 2, a

statute cited in connection with  Counts Nine, Ten, Fifteen,

Sixteen, Seventeen and Eighteen, provides that whoever commands,

procures, assists in, or causes the commission of a crime shall

be held accountable and punished in the same manner as the

principal, or the person who actually carried out the task.  This

means that the guilt of Tellez may also be proved even if he did

not personally perform every act involved in the commission of

the crime charged (possession of marijuana) with intent to

distribute).  The law recognizes that, ordinarily, anything a

person can do for himself may also be accomplished through

direction of another person as an agent, or by acting together

with, or under the direction of, another person or persons in a

joint effort.  So, if the acts or conduct of an agent, employee

or other associate of Tellez were willfully directed or

authorized by Tellez, or if Tellez aided and abetted another

person by willfully joining together with that person in the

commission of a crime, then the law holds Tellez responsible for

14

the conduct of that other person just as though Tellez had
engaged in such conduct himself.  The maximum penalty for the
violation alleged in Count Nine of the Indictment (less than
fifty kilograms of marijuana) is pursuant to Section
841(b)(1)(d) is not more than five years, and a fine of not more
than $250,000 and a supervised release term of at least two
years.  The maximum penalty for the violation alleged in Count
Ten, Count Fifteen, Count Sixteen, Count Seventeen, and Count
Eighteen of the indictment( more than 100 kilograms of marijuana)
is not more than 40 years and a fine not to exceed $2,000,000 and
a supervised release term of at least four years.

17.  In Counts Eleven (11), Twelve (12), Thirteen (13), and
Fourteen (14), Tellez is charged with knowingly conducting and
attempting to conduct a financial transaction affecting
interstate and foreign commerce, to wit, the receipt and
transportation of monies which involved the proceeds of a
specified unlawful activity, that is, the distribution of a
controlled substance, with the intent to promote the carrying on
of said specified unlawful activity, while knowing that the
financial transaction, represented the proceeds of some form of
unlawful activity.  In order to convict Tellez of the offenses
charged in Counts Eleven, Twelve, Thirteen and Fourteen of the
Indictment, the United States must prove at trial that 1) he
knowingly conducted, or attempted to conduct a financial

15

transaction, 2) that the financial transaction, or attempted financial transaction involved the proceeds of a specified unlawful activity, that is, the proceeds of the distribution of narcotics, 3) that he knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity; and, 4) that he intended to promote the carrying on of the specified unlawful activity.   Title 18, United States Code, Section 2, a statute cited in connection with Counts Eleven, Twelve, Thirteen and Fourteen, provides that whoever commands, procures, assists in, or causes the commission of a crime shall be held accountable and punished in the same manner as the principal, or the person who actually carried out the task.   This means that the guilt of Tellez may also be proved even if he did not personally perform every act involved in the commission of the crime charged (laundering of monetary instruments).   The law recognizes that, ordinarily, anything a person can do for himself may also be accomplished through direction of another person as an agent, or by acting together with, or under the direction of, another person or persons in a joint effort.   So, if the acts or conduct of an agent, employee or other associate of Tellez were willfully directed or authorized by Tellez, or if Tellez aided and abetted another person by willfully joining together with that person in the commission of a crime, then the law holds Tellez responsible for

16

the conduct of that other person just as though Tellez had engaged in such conduct himself. The maximum penalty for a violation of Title 18, United States Code, Section 1956(a)(1)(A)(I) is imprisonment for not more than twenty (20) years and a fine of not more than $500,000 and a term of supervised release of at least two years but not more than three years.

18. The United States will prove its case against Tellez through eyewitness testimony, consensual recordings, and other documentary and physical evidence, such as the evidence of the cocaine and marijuana that have been seized and photographs taken during government surveillance.

19. The defendant, Tellez, is a naturalized United States citizen who was born in General Teran, Nuevo Leon, Mexico on January 28, 1971. He has not been tried or convicted of any offenses charged in this indictment nor has he been sentenced to serve any sentence in connection with this case.

20. Of the individuals named in the indictment with Tellez, in M-00-439, eleven have been arrested, and three are fugitives (and the subject of provisional arrest warrants, Eloy Saenz, Mario Valdez and Rosa Maria Tellez.) Of the eleven that have been arrested, seven have pleaded guilty (Rosa Amelia Valdez, Gerardo Valdez, Nicolas Gonzalez, Santiago Vela, Rolando Villalobos, Sergio Guerra, and Guadalupe Garcia) to the offenses

which involve Mario Tellez.  In a companion case, arising out of the same investigation, M-00-440, six people were indicted, four were arrested and two are fugitives (Rolando Gallegos is the subject of a provisional arrest warrant).  Of the four people arrested, three (Alberto Gonzalez, Roberto Carlos Balderas, and Ernesto Moya,) have pleaded guilty and one, Mario Martinez, was convicted in the Southern District of Texas after a jury trial for the offenses in which Tellez was involved.  Attached as **Exhibit D** and **Exhibit E** respectively are the transcripts of the trial testimony of Francisco Guevara (Sebastian) and Guadalupe Garcia in the trial of Mario Martinez detailing Tellez's involvement in the offenses charged in M-00-439.

<u>SUMMARY OF THE FACTS OF THE CASE</u>

21.   This investigation targeted the Juan Lozano drug trafficking organization which transports marijuana and cocaine in the United States through the Rio Grande Valley of Texas on to various cities in the United States to include Chicago, Illinois, New York, New York, and New Jersey.  The genesis of this investigation was the seizure of 497 kilos of cocaine in Waukegan, Illinois as the result of an Federal Bureau of Investigation (FBI) undercover operation.  The seizure of cocaine resulted in the arrest and ultimate conviction of two defendants from the McAllen area who in turn identified Juan Manuel Lozano as the owner of the cocaine.

On October 16, 1998, Drug Enforcement Administration agents in McAllen, Texas, seized approximately 608 kilograms of cocaine and 65 pounds of marijuana from a warehouse in San Juan, Texas. Leonel de Anda-Hernandez, Ricardo Gonzalez-Vasquez and Horacio Gonzalez were prosecuted in McAllen, Jorge Casas, was prosecuted and convicted in Houston, Texas.  Casas identified the cocaine as coming from Juan Lozano, and indicated that he had been transporting cocaine for the Lozano organization since late 1997 and identified several loads of cocaine that he had arranged to transport for the Lozano organization. He also identified several additional loads of cocaine that belonged to the Lozano organization that were seized by law enforcement: 1) 667 kilograms of cocaine, 820 kilograms of marijuana, on April 7, 1998 in St. Louis County, Missouri, and 2) 470 kilograms of cocaine on September 9, 1998 in San Manuel, Texas.  He identified Tellez as a lieutenant in the Juan Lozano organization who he met in New York and New Jersey to off-load cocaine for the Juan Lozano organization.  Additional co-operating individuals have corroborated Tellez's role in arranging for the transportation and off-loading of cocaine to the New York and New Jersey area.

During the course of the investigation, several loads of marijuana were seized from the Juan Lozano organization, and the investigation revealed that Mario Tellez was instrumental in arranging the transportation for the marijuana that was

ultimately seized by law enforcement.  For example, 92 pounds of marijuana were seized from the organization in Houston, Texas, on February 3, 2000 (Count Nine), 1,260 pounds of marijuana were seized in Illinois on April 13, 2000 (with the additional assistance of a confidential informant)(Count Sixteen), and 2,037 pounds of marijuana were seized in Illinois on April 30,2000 (Count Seventeen).  In addition, the investigation linked an additional 350 pounds of marijuana seized in Michigan on February 21, 2000 (Count Ten) and 1,363 pounds of marijuana seized in Illinois on April 3, 2000 (Count Fifteen) to Mario Tellez and the Lozano organization.

On April 3, 2000, Francisco Guevara (Sebastien)(hereafter Guevara) was arrested in Bloomington, Illinois, as he attempted to take delivery of approximately 572 kilograms of marijuana (Count Fifteen). He has implicated Mario Tellez in this, and other loads of marijuana and a load of cocaine that he off-loaded in the Chicago area. (See **Exhibit D**, a transcript of Guevara's testimony in the trial of Mario Martinez.)  For example, as detailed in the transcript, he was told by Hugo Perez that the marijuana he was off-loading in Chicago belonged to Mario Tellez. At some point, Francisco Guevara began to deal directly with Mario Tellez and to receive instructions from Mario Tellez concerning money pick-ups and instructions concerning narcotic loads.  Mario Tellez in turn told Guevara that he worked for Juan

Lozano.  Guevara's testimony concerning Tellez has been corroborated through the investigation, particularly with respect to the money deliveries he made for Tellez which are also corroborated by FBI surveillance.  For example, Guevara, on instructions from Mario Tellez, took $40,000 to San Antonio, Texas, from Chicago, Illinois for delivery to Mario Tellez and Mario Valdez (Count Eleven).   The investigation revealed that Mario Valdez and Mario Tellez borrowed Rolando Villalobos's truck to pick-up the money because it had a "soft spot" to hide the money.  FBI surveillance agents took surveillance photos of Guevara at the motel waiting to meet with Mario Tellez and Mario Valdez.  After he left, FBI surveillance agents seized Guevara's bus ticket and obtained copies of the motel registration cards.  Guevara has subsequently identified pictures of Rolando Villalobos' truck as the vehicle that Mario Tellez used when he picked up the $40,000 from Guevara.  According to Guevara, he was sent by Mario Tellez to deliver $20,000 to Nicolas Gonzalez as payment for a load of narcotics that Gonzalez had delivered for Tellez (Count Twelve). FBI surveillance corroborated the meeting between Guevara and Nicolas Gonzalez, and, as a result of this surveillance, the money was seized from Nicolas Gonzalez by officers of the Dallas Police Department on March 8, 2000.  Additionally, according to Guevara, he was sent by Mario Tellez to deliver $44,500 to Guadalupe Garcia (See, **Exhibit E,**

transcript of the testimony of Guadalupe Garcia in the trial of Mario Martinez)in Dallas, Texas.  FBI surveillance was able to observe the meeting, and further investigation revealed that the monies were ultimately delivered to Mario Martinez.

Additionally, the investigation revealed that Lozano, Valdez and Tellez used coded conversations to discuss arrangements for payments, loads, and the problems with seizures. For example, the investigation revealed that,in February, 2000, Tellez made arrangements to transport a load of marijuana to Houston (Count Nine).  It was taken to Houston by Gerardo Valdez and Roberto Carlos Balderas (who were followed by FBI surveillance).  The investigation revealed that when its intended recipient was not satisfied with the price, Tellez instructed Valdez to pick it up at Church's Fried Chicken.   When Gerardo Valdez "made" surveillance, the investigation revealed that Valdez left the car at the Church's Fried Chicken (where it was seized by law enforcement) and, pursuant to Tellez's instructions Valdez got rid of the phone.

Tellez also negotiated directly with an FBI confidential informant.  In March of 2000, Tellez arranged for Hugo Perez to deliver $50,000 to an individual who was an FBI confidential informant.  FBI surveillance agents observed the meeting and took photographs of the money which was ultimately delivered to Mario Tellez and Mario Valdez (Count Thirteen).  In April of 2000,

22

Tellez made arrangements with the confidential informant for the delivery of 572 kilograms of marijuana to Chicago, Illinois which was seized by law enforcement in Chicago.  Tellez role in arranging for the transportation of this marijuana to Chicago, is corroborated by the statements of several co-operating individuals.

Finally in June and July, Mario Tellez and Mario Valdez arranged to deliver approximately 1400 pounds of marijuana to the same FBI confidential informant for delivery to Illinois.  The conversations between the confidential informant and Mario Tellez and Mario Valdez were recorded (Count Eighteen).

CONCLUSION

22.  I have attached to this affidavit, as **Exhibit F**, the original affidavit of Wayne Furnia, Special Agent of the United States Federal Bureau of Investigation.  In his affidavit, Special Agent Furnia summarizes the investigation of Jose Mario Tellez's activities and the evidence which resulted in the indictment in this case.  Attached as **Attachment 1** to the affidavit of Special Agent Furnia is a photograph of Jose Mario Tellez.  This affidavit and the affidavit of Special Agent Furnia were sworn to before a Magistrate Judge of the United States District Court for the Southern District of Texas, who is a person duly empowered to administer an oath for this purpose.

21.  I have reviewed the affidavit of Special Agent Wayne

Furnia and the evidence in this case and attest that the evidence indicates that Jose Mario Tellez is guilty of the offenses for which extradition is sought.

Patricia Cook Profit
ASSISTANT UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF TEXAS


SWORN AND SUBSCRIBED BEFORE ME
THIS _15th_ DAY OF May, 2002.


UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF TEXAS

24

## 18 § 3282

### § 3282.  Offense not capital

Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed.

GOVERNMENT
EXHIBIT
A

**21 USC § 846**

**§ 846.  Attempt and conspriacy**

   Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

## 18 USC § 2

**§ 2.  Principals**

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

<u>21 § 841</u>

**§ 841.  Prohibited acts A**

**(a) Unlawful acts**

Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally–

(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance; or

(2) to create, distribute, or dispense or possess with intent to distribute or dispense, a counterfeit substance.

**(b) Penalties**

Except as otherwise provided in section 859, 860, or 861 of this title, any person who violates subsection (a) of this section shall be sentenced as follows:

(1)(A) In the case of a violation of subsection (a) of this section involving–

...

(ii) 5 kilograms or more of a mixture or substance containing a detectable amount of–

(I) coca leaves, except coca leaves and extracts of coca leaves from which cocaine, ecgonine, and derivatives of ecgonine or their salts have been removed;

(II) cocaine, its salts, optical and geometric isomers, and salts of isomers;

(III) ecgonine, its derivatives, their salts, isomers, and salts of isomers; or

(IV) any compound, mixture, or preparation which contains any quantity of any of the substances referred to in subclauses (I) through (III);

...

(vii) 1000 kilograms or more of a mixture or substance containing a detectable amount of marijuana, or 1,000 or more marijuana plants regardless of weight; or

such person shall be sentenced to a term of imprisonment which may not be less than 10 years or more than life and if death or serious bodily injury results from the use of such substance shall be not less than 20 years or more than life, a fine not to exceed the greater of that authorized in accordance with the provisions of Title 18, or $4,000,000 if the defendant is an individual or $10,000,000 if the defendant is other than an individual, or both...  Any sentence under this subparagraph shall, in the absence of such a prior conviction, impose a term of supervised release of at least 5 years in addition to such term of imprisonment and shall, if there was such a prior conviction, impose a term of supervised release of at least 10 years in addition to such term of imprisonment  Notwithstanding any other provision of law, the court shall not place on probation or suspend the sentence of any person sentenced under this subparagraph.  No person sentenced under this subparagraph shall be eligible for parole during the term of imprisonment imposed therein.

(B) In the case of a violation of subsection (a) of this section involving–

    ...

    (vii) 100 kilograms or more of a mixture or substance containing a detectable amount of marijuana, or 100 or more marijuana plants regardless of weight; or

such persons hall be sentenced to a term of imprisonment which may not be less than 5 years and not more than 40 years and if death or serious bodily injury results from the use of such substance shall be not less than 20 years or more than life, a fine not to exceed the greater of that authorized in accordance with the provisions of Title 18, or $2,000,000 if the defendant is an individual or $5,000,000 if the defendant is other than an individual, or both...   Any sentence imposed under this subparagraph shall, in the absence of such a prior conviction, include a term of supervised release of at least 4 years in addition to such term of imprisonment and shall, if there was such a prior conviction, include a term of supervised release of at least 8 years in addition to such term of imprisonment.  Notwithstanding any other provision of law, the court shall not place on probation or suspend the sentence of any person sentenced under this subparagraph.  No person sentenced under this subparagraph shall be eligible for parole during the term of imprisonment imposed therein.

(C) In the case of a controlled substance in schedule I or II, ..., such person shall be sentenced to a term of imprisonment of not more than 20 years and if death or serious bodily injury results from the use of such substance shall be sentenced to a term of imprisonment of not less than twenty years or more than life, a fine not to exceed the greater of that authorized in accordance with the provisions of Title 18, or $1,000,000 if the defendant is an individual or $5,000,000 if the defendant is other than an individual, or both...   Any sentence imposing a term of imprisonment under this paragraph shall , in the absence of such a prior conviction, impose a term of supervised release of at least 3 years in addition to such term of imprisonment and shall, if there was such a prior conviction, impose a term of supervised release of at least 6 years in addition to such term of imprisonment.  Notwithstanding any other provision of law, the court shall not place on probation or suspend the sentence of any person sentenced under the provisions of this subparagraph which provide for a mandatory term of imprisonment if death or

serious bodily injury results, nor shall a person so sentenced be eligible for parole during the term of such a sentence.

(D) In the case of less than 50 kilograms of marijuana, ... such person shall, except as provided in paragraph (4) and (5) of this subsection, be sentenced to a term of imprisonment of not more than 5 years, a fine not to exceed the greater of that authorized in accordance with the provisions of Title 18, or $250,000 if the defendant is an individual or $1,000,000 if the defendant is other than an individual, or both...   Any sentence imposing a term of imprisonment under this paragraph shall, in the absence of such a prior conviction, impose a term of supervised release of at least 2 years in addition to such term of imprisonment and shall, if there was such a prior conviction, impose a term of supervised release of at least 4 years in addition to such term of imprisonment...

## 18 USC § 1956

### § 1956.  Laundering of monetary instruments

(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity–

> (A)(i) with the intent to promote the carrying on of specified unlawful activity; or...

> (B) knowing that the transaction is designed in whole or in part–

>> (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or...

shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

(2) Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States–

> (A) with the intent to promote the carrying on of specified unlawful activity; or

> (B) knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part–

>> (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or

>> (ii) to avoid a transaction reporting requirement under State or Federal law,

shall be sentenced to a fine of not more than $500,000 or twice the value of the monetary instrument or funds involved in the transportation, transmission, or transfer whichever is greater, or imprisonment for not more than twenty years, or both.  For the purpose of the offense described in subparagraph (B), the defendant's knowledge may be established by proof that a law enforcement officer represented the matter specified in subparagraph (B) as true, and the defendant's subsequent statements or actions indicate that the defendant believed such representations to be true.



**UNSEALED**
2-5-01

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### MCALLEN DIVISION

United States District Court
Southern District of Texas
FILED

**AUG 29 2000**

Michael N. Milby, Clerk of Court

| | |
|---|---|
| UNITED STATES OF AMERICA, | § |
| | § |
| v. | § CRIMINAL NO. **M-00-439** |
| | § |
| JUAN LOZANO, | § |
| MARIBEL LOZANO, | § |
| JOSE MARIO TELLEZ, | § |
| ROSA TELLEZ, | § |
| also known as Maria Tellez | § |
| MARIO VALDEZ, | § |
| ROSA AMELIA VALDEZ, | § |
| RAY PEREZ, | § |
| GERARDO VALDEZ, | § |
| NICOLAS GONZALEZ, JR., | § |
| ELOY SAENZ, | § |
| SANTIAGO VELA, | § |
| ROLANDO VILLALOBOS, | § |
| SERGIO GUERRA, | § |
| GUADALUPE GARCIA, and | § |
| RUMALDO LOZANO | § |

*rol* (1/25/01)

*nal* (2/30/01)

## SEALED INDICTMENT

THE GRAND JURY CHARGES:

### Count One

Beginning on or about January of 1995 and continuing until the present, in the Southern

District of Texas and within the jurisdiction of the Court, defendants

JUAN LOZANO,
JOSE MARIO TELLEZ,
MARIO VALDEZ,
RAY PEREZ,
GERARDO VALDEZ,
ELOY SAENZ,
SANTIAGO VELA,
SERGIO GUERRA, and
GUADALUPE GARCIA

did knowingly and intentionally conspire and agree with other persons known and unknown to



GOVERNMENT
EXHIBIT
B

the Grand Jurors, to knowingly and intentionally possess with intent to distribute more than 5

kilograms of cocaine, a Schedule II Controlled Substance.

In violation of Title 21, United States Code, Sections 846, 841(a)(1), and 841(b)(1)(A).

### Count Two

Beginning on or about January of 1995 and continuing until the present, in the Southern

District of Texas and within the jurisdiction of the Court, defendants

**JUAN LOZANO,**
**JOSE MARIO TELLEZ,**
**MARIO VALDEZ,**
**GERARDO VALDEZ**
*red*  1/30/01   **NICOLAS GONZALEZ,** JR.
**SANTIAGO VELA,**
**ROLANDO VILLALOBOS,**
**SERGIO GUERRA, and**
**GUADALUPE GARCIA**

did knowingly and intentionally conspire and agree with other persons known and unknown to

the Grand Jurors, to knowingly and intentionally possess with intent to distribute more than 1000

kilograms of marijuana, a Schedule I Controlled Substance.

In violation of Title 21, United States Code, Sections 846, 841(a)(1), and 841(b)(1)(A).

### Count Three

From on or about 1995, ongoing and continuing to the present, in the Southern District of

Texas, and elsewhere within the jurisdiction of this Court, defendants

**JUAN LOZANO,**
*red* (1/25/01) Marivel  ~~MARIBEL~~ **LOZANO,**
**JOSE MARIO TELLEZ,**
**ROSA MARIA TELLEZ**
also known as  Maria Tellez
**MARIO VALDEZ,**
**ROSA AMELIA VALDEZ,**
**RAY PEREZ,**
**GERARDO VALDEZ,**

ᴧᴜᴸ (1/30/01)  NICOLAS GONZALEZ, JR.,
ROLANDO VILLALOBOS,
SERGIO GUERRA,
GUADALUPE GARCIA and
RUMALDO LOZANO

did unlawfully, willfully and knowingly combine, conspire, confederate, and agree together and

with each other, and with others known and unknown to the Grand Jury, to commit certain

offenses under Title 18, United States Code, Section 1956, as follows:

(A) to conduct and attempt to conduct a financial transaction affecting interstate

commerce, which transaction involved the proceeds of specified unlawful activity, that is,

distribution of controlled substances, with

(1) the intent to promote the carrying on of such specified unlawful activity and

(2) knowing that the transaction was designed in whole or in part to conceal and disguise

the nature, location, source, ownership, and control of the proceeds of said specified

unlawful activity, and that while conducting and attempting to conduct such a financial

transactions, that the property involved in the financial transactions, that is the monetary

instruments, represented the proceeds of some form of unlawful activity in violation of

Title 18, United.States Code, Section 1956 (a)(1).

(B) knowingly to transport, transmit and transfer and attempt to transport, transmit and

transfer a monetary instrument and funds from a place in the United States to and through a place

outside the United States with the intent to promote the carrying on of specified unlawful

activity, in violation of Title 18, United States Code, Section 1956(a)(2)(A).

## Manner and Means

It was the ways, manner and means of this conspiracy that the defendants would receive,

transfer, transport, and deliver the proceeds earned from the distribution and transportation of

narcotics in order to promote the further distribution and transportation of narcotics, and transport and transfer the proceeds in a manner designed in whole or in part to disguise the source, ownership, nature, location or control of the proceeds of a specified unlawful activity, wire transfer proceeds earned from the distribution transportation of narcotics via Western Union in order to promote the further distribution and transportation of narcotics and to disguise the nature, source, location, ownership, and control of the proceeds of the transportation and distribution of narcotics, and to transport, transmit, and transfer monetary instruments and funds from a place in the United States to a place outside the United States in order to promote the further distribution of narcotics.

### Overt Acts

In furtherance of this conspiracy and to effect the objects thereof, the following overt acts, among others, were committed in the Southern District of Texas:

1.   Counts One, Two, Four, Five, Six, Seven, Eight, Nine, Ten, Fifteen, Sixteen, Seventeen, Eighteen and Nineteen are hereby realleged and incorporated herein as if set forth verbatim.

2.   In September of 1997, Maribel Lozano negotiated a check in the amount of $255,976.19 made payable to Maribel and Victor Lozano, as husband and wife, drawn on Texas State Bank, knowing such monies were the proceeds of illegal activity, and knowing that the transaction, which identified Victor Lozano as her husband, when in fact, Juan Lozano was her husband, was intended to disguise the source, ownership, and control of said funds

3.   In September of 1997, Maribel Lozano transferred the $255,976.19 from a place in the United States to a place outside the United States in Mexico.

4.   In April of 1998, a co-conspirator who has been indicted elsewhere received $600,000 from a Colombian as payment for 700 kilograms of cocaine

5. In April of 1998, a co-conspirator who has been indicted elsewhere gave the $600,000 to Jose Mario Tellez who concealed the money in the trailer used by Ray Perez to transport the cocaine to New Jersey.

6. In April of 1998, Ray Perez drove the trailer containing the concealed $600,000 back to McAllen, Texas, where he returned the $600,000 to the co-conspirator who has been indicted elsewhere.

7. In April of 1998, the co-conspirator who has been indicted elsewhere delivered the money to Juan Lozano.

8. On or about July 7, 1998 a co-conspirator who has been indicted elsewhere concealed $800,000 in pallets of used clothing which he had transported from New York to a warehouse in Pharr, Texas.

9. In July of 1998, a co-conspirator who has been indicted elsewhere took the $800,000 from where it was concealed in the warehouse in Pharr, Texas, and concealed it in a hidden compartment in a 1988 Chevrolet Malibu belonging to Juan Lozano.

10. In July of 1998, a co-conspirator who has been indicted elsewhere drove the 1988 Chevrolet Malibu with the $800,000 concealed in the hidden compartment from Pharr, Texas to Mexico where he delivered the money to Juan Lozano.

11. On February 27, 2000, a co-conspirator who has been charged elsewhere received $40, 000 as payment for a load of marijuana that Nicolas Gonzalez arranged to have transported to Chicago, Illinois.

12. On February 27, 2000, the co-conspirator who has been charged elsewhere, carrying the money on his body, transported the $40,000 by bus from Chicago, Illinois to San Antonio,

Texas where he delivered the money to Mario Valdez and Jose Mario Tellez on February 28, 2000

13   On February 28, 2000, Mario Valdez and Jose Mario Tellez concealed the $40,000 inside the back light of a white pick-up truck that was owned by Rolando Villalobos and provided by Villalobos to Valdez and Tellez for the purpose of transporting money.

14.   On February 29, 2000, Mario Valdez and Jose Mario Tellez drove the white pick-up truck from San Antonio, Texas to McAllen, Texas where they delivered the $40,000 to Rosa Valdez who verified the amount by counting the money.

15   On February 29, 2000, Juan Lozano told Mario Valdez to give the $20,000 to Rumaldo Lozano, and Mario Valdez instructed Rosa Valdez to give the $20,000 to Rumaldo Lozano.

16.   On February 29, 2000, Rumaldo Lozano picked up the $20,000 from Rosa Valdez.

17.   On March 2, 2000, an unindicted co-conspirator, using another's name as sender, caused $900.00 to be wire transferred via Western Union from Hanover Park, Illinois to Rolando Villalobos, in Mission, Texas.

18.   On March 2, 2000, an unindicted co-conspirator, using another's  name as sender, caused $900.00 to be wire transferred via Western Union from Hanover Park, Illinois, to Jose Mario Tellez, in Weslaco, Texas, using another individual's name as recipient.

19.   On March 2, 2000, an unindicted co-conspirator, using another's name as sender, caused $900.00 to be wire transferred via Western Union from Hanover Park, Illinois, to  Maria Tellez, in Weslaco, Texas.

20.   On March 2, 2000, an unindicted co-conspirator, using another's name as sender, caused $900.00 to be wire transferred via Western Union from Hanover Park, Illinois, to

Gerardo Valdez, in Weslaco, Texas.

21.    In March of 2000, a co-conspirator who has been charged elsewhere, received $20,000 that Jose Mario Tellez and others directed an unindicted co-conspirator to send to Nicolas Gonzalez in Dallas, Texas, as partial payment for a load of marijuana Nicolas Gonzalez had delivered to Chicago, Illinois.

22.    On or about March 7, 2000, a co-conspirator who has been charged elsewhere traveled by bus from Chicago, Illinois to Dallas, Texas with the $20,000 on his body and delivered the money to Nicolas Gonzalez in his Suburban.

23.    On or about March 14, 2000, Jose Mario Tellez and Mario Valdez instructed a co-operating individual to travel to Chicago, Illinois to receive $50,000 in proceeds from an unindicted co-conspirator and to deliver the $50,000 to Jose Mario Tellez and Mario Valdez in McAllen, Texas.

24.    On or about March 20, 2000, a co-conspirator who has been charged elsewhere received $44,500 in Chicago, Illinois.

25.    On or about March 20, 2000, a co-conspirator who has been charged elsewhere carried the $44,500 on his body by bus from Chicago, Illinois to Dallas, Texas where he delivered the $44,500 to Guadalupe Garcia inside Guadalupe Garcia's white pick up truck on March 21, 2000.

26.    On or about March 21, 2000, Guadalupe Garcia transported the $44,500 from Dallas, Texas to McAllen, Texas where he delivered the $44,500 to Mario Valdez and Jose Mario Tellez.

27.    On or about March 21, 2000, Juan Lozano directed Mario Valdez and Jose Mario Tellez to bring the $44,5000 to his house in Mexico.

28.  On or about March 22, 2000 Guadalupe Garcia, Mario Valdez and Jose Mario Tellez traveled to Mexico where they delivered the $44,500 to a co-conspirator at Juan Lozano's house

29.  On March 25, 2000 José Mario Tellez tells Rolando Villalobos that he owes him $60,000 but can only pay him $30,000.

30.  On March 25, 2000 Rolando Villalobos tells Jose Mario Tellez to make the arrangements with an unindicted co-conspirator to give the $30,000 to Sergio Guerra in Chicago, Illinois.

31.  On March 25, 2000, Jose Mario Tellez tells an unindicted co-conspirator to give Sergio Guerra $30,000.

32.  On March 25, 2000, an unindicted co-conspirator, using another's name as sender, caused $900.00 to be wire transferred via Western Union from Hanover Park, Illinois, to Rolando Villalobos, in Mission, Texas, using another individual's name as recipient.

33.  On March 26, 2000, an unindicted co-conspirator, using another's name as sender, caused $900.00 to be wire transferred via Western Union from Hanover Park, Illinois, to Rolando Villalobos, in Mission, Texas.

All in violation of Title 18, United States Code, Section 1956(h).

### Count Four

On or about April 7, 1998, in the Southern District of Texas and within the jurisdiction of the Court, defendant

### JUAN LOZANO

did knowingly and intentionally possess with the intent to distribute more than 5 kilograms of cocaine, that is, approximately 667 kilograms of cocaine, a Schedule II Controlled Substance

In violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A) and Title 18, United States Code, Section 2

## Count Five

On or about April 7, 1998, in the Southern District of Texas and within the jurisdiction of the Court, defendant

### JUAN LOZANO

did knowingly and intentionally possess with the intent to distribute more than 100 kilograms, but less than a 1000 kilograms of marijuana, that is, approximately 820 kilograms of marijuana, a Schedule I Controlled Substance.

In violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B) and Title 18, United States Code, Section 2.

## Count Six

On or about September 9, 1998, in the Southern District of Texas and within the jurisdiction of the Court, defendants,

### JUAN LOZANO,
### JOSE MARIO TELLEZ,
### MARIO VALDEZ,
### RAY PEREZ,
### GERARDO VALDEZ,
### ELOY SAENZ, and
### GUADALUPE GARCIA

did knowingly and intentionally possess with the intent to distribute more than 5 kilograms of cocaine, that is, approximately 470 kilograms of cocaine, a Schedule II Controlled Substance.

In violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A) and Title 18, United States Code, Section 2.

### Count Seven

On or about October 16, 1998, in the Southern District of Texas and within the jurisdiction of the Court, defendant

### JUAN LOZANO

did knowingly and intentionally possess with the intent to distribute more than 5 kilograms of cocaine, that is, approximately 608 kilograms of cocaine, a Schedule II Controlled Substance.

In violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A) and Title 18, United States Code, Section 2.

### Count Eight

On or about December 18, 1999, in the Southern District of Texas and within the jurisdiction of the Court, defendants

### JUAN LOZANO,
### ELOY SAENZ, and
### SANTIAGO VELA

did knowingly and intentionally possess with the intent to distribute more than 5 kilograms of cocaine, that is, approximately 385 kilograms of cocaine, a Schedule II Controlled Substance.

In violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A) and Title 18, United States Code, Section 2.

### Count Nine

On or about February 3, 2000, in the Southern District of Texas and within the jurisdiction of the Court, defendants

### JOSE MARIO TELLEZ, and
### GERARDO VALDEZ

did knowingly and intentionally possess with the intent to distribute less than 50 kilograms of

attempting to conduct such financial transaction, the defendant knew that the property involved in the financial transaction, that is monetary instruments, represented the proceeds of some form of unlawful activity

In violation of Title 18, United States Code, Section, 1956(a)(1)(A)(I) and Section 2.

### Count Fifteen

On or about April 3, 2000, in the Southern District of Texas and within the jurisdiction of the Court, defendants

**JUAN LOZANO,
JOSE MARIO TELLEZ,
MARIO VALDEZ,
GERARDO VALDEZ,**
n a*(1/30/01) **NICOLAS GONZALEZ,   JR.,
SANTIAGO VELA,
ROLANDO VILLALOBOS,
SERGIO GUERRA, and
GUADALUPE GARCIA**

did knowingly and intentionally possess with the intent to distribute more than 100 but less than 1000 kilograms of marijuana, that is, approximately 619 kilograms of marijuana, a Schedule I Controlled Substance.

In violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B) and Title 18, United States Code, Section 2.

### Count Sixteen

On or about April 13, 2000, in the Southern District of Texas and within the jurisdiction of the Court, defendants

**JUAN LOZANO,
JOSE MARIO TELLEZ,
MARIO VALDEZ,
GERARDO VALDEZ,**
n a*(1/30/01) **NICOLAS GONZALEZ, JR.,**

**SANTIAGO VELA,**
**ROLANDO VILLALOBOS,**
**SERGIO GUERRA, and**
**GUADALUPE GARCIA**

did knowingly and intentionally possess with the intent to distribute more than 100 kilograms,

but less than a 1000 kilograms of marijuana, that is, approximately 572 kilograms of marijuana,

a Schedule I Controlled Substance.

In violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B) and

Title 18, United States Code, Section 2.

### Count Seventeen

On or about April 30, 2000, in the Southern District of Texas and within the jurisdiction

of the Court, defendants

**JUAN LOZANO,**
**JOSE MARIO TELLEZ,**
**MARIO VALDEZ,**
**GERARDO VALDEZ,**
ᴧ ᵃᵈ (1/30/01) **NICOLAS GONZALEZ, JR.,**
**SANTIAGO VELA,**
**ROLANDO VILLALOBOS,**
**SERGIO GUERRA, and**
**GUADALUPE GARCIA**

did knowingly and intentionally possess with the intent to distribute more than 100 kilograms,

but less than a 1000 kilograms of marijuana, that is, approximately 925 kilograms of marijuana,

a Schedule I Controlled Substance.

In violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B) and

Title 18, United States Code, Section 2.

## Count Eighteen

On or about July 13, 2000, in the Southern District of Texas and within the jurisdiction of the Court, defendants

**JUAN LOZANO,**
**JOSE MARIO TELLEZ, and**
**MARIO VALDEZ**

did knowingly and intentionally possess with the intent to distribute more than 100 kilograms, but less than a 1000 kilograms of marijuana, that is, approximately 625 kilograms of marijuana, a Schedule I Controlled Substance.

In violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B) and Title 18, United States Code, Section 2

## Count Nineteen

On or about July 18, 2000, in the Southern District of Texas and within the jurisdiction of the Court, defendant

**RAY PEREZ**

did knowingly and intentionally possess with the intent to distribute more than 100 kilograms, but less than a 1000 kilograms of marijuana, that is, approximately 254 kilograms of marijuana, a Schedule I Controlled Substance.

In violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B) and Title 18, United States Code, Section 2.

did knowingly conduct and attempt to conduct a financial transaction affecting interstate and

foreign commerce, to wit, the receipt and transportation of $40,000 which involved the proceeds

of a specified unlawful activity, that is the distribution of a controlled substance, with the intent

to promote the carrying on of said specified unlawful activity, and that while conducting and

attempting to conduct such financial transaction, the defendant knew that the property involved

in the financial transaction, that is monetary instruments, represented the proceeds of some form

of unlawful activity.

In violation of Title 18, United States Code, Section, 1956(a)(1)(A)(I) and Section 2.

### Count Twelve

On or about March 8, 2000, in the Southern District of Texas and elsewhere within the

jurisdiction of the Court, defendants

**JUAN LOZANO,**
**JOSE MARIO TELLEZ,**
**MARIO VALDEZ, and**
०४${}^{}$(1/30/01)   **NICOLAS GONZALEZ, ¯JR.,**

did knowingly conduct and attempt to conduct a financial transaction affecting interstate and

foreign commerce, to wit, the receipt and transportation of $20,000 which involved the proceeds

of a specified unlawful activity, that is the distribution of a controlled substance, with the intent

to promote the carrying on of said specified unlawful activity, and that while conducting and

attempting to conduct such financial transaction, the defendant knew that the property involved

in the financial transaction, that is monetary instruments, represented the proceeds of some form

of unlawful activity.

In violation of Title 18, United States Code, Section, 1956(a)(1)(A)(I) and Section 2

## Count Thirteen

On or about March 14, 2000, in the Southern District of Texas and elsewhere within the jurisdiction of the Court, defendants

**JUAN LOZANO,
JOSE MARIO TELLEZ, and
MARIO VALDEZ**

did knowingly conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, to wit, the receipt and transportation of $50,000 which involved the proceeds of a specified unlawful activity, that is the distribution of a controlled substance, with the intent to promote the carrying on of said specified unlawful activity, and that while conducting and attempting to conduct such financial transaction, the defendant knew that the property involved in the financial transaction, that is monetary instruments, represented the proceeds of some form of unlawful activity.

In violation of Title 18, United States Code, Section, 1956(a)(1)(A)(I) and Section 2

## Count Fourteen

On or about March 22, 2000, in the Southern District of Texas and elsewhere within the jurisdiction of the Court, defendants

**JUAN LOZANO,
JOSE MARIO TELLEZ,
MARIO VALDEZ, and
GUADALUPE GARCIA**

did knowingly conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, to wit, the receipt and transportation of $44,500 which involved the proceeds of a specified unlawful activity, that is the distribution of a controlled substance, with the intent to promote the carrying on of said specified unlawful activity, and that while conducting and

attempting to conduct such financial transaction, the defendant knew that the property involved in the financial transaction, that is monetary instruments, represented the proceeds of some form of unlawful activity

In violation of Title 18, United States Code, Section, 1956(a)(1)(A)(I) and Section 2.

### Count Fifteen

On or about April 3, 2000, in the Southern District of Texas and within the jurisdiction of the Court, defendants

**JUAN LOZANO,**
**JOSE MARIO TELLEZ,**
**MARIO VALDEZ,**
**GERARDO VALDEZ,**
n⁴ˡ(1/30/01) **NICOLAS GONZALEZ, JR.,**
**SANTIAGO VELA,**
**ROLANDO VILLALOBOS,**
**SERGIO GUERRA, and**
**GUADALUPE GARCIA**

did knowingly and intentionally possess with the intent to distribute more than 100 but less than 1000 kilograms of marijuana, that is, approximately 619 kilograms of marijuana, a Schedule I Controlled Substance.

In violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B) and Title 18, United States Code, Section 2.

### Count Sixteen

On or about April 13, 2000, in the Southern District of Texas and within the jurisdiction of the Court, defendants

**JUAN LOZANO,**
**JOSE MARIO TELLEZ,**
**MARIO VALDEZ,**
**GERARDO VALDEZ,**
nᵘˡ(1/30/01) **NICOLAS GONZALEZ, JR.,**

**SANTIAGO VELA,**
**ROLANDO VILLALOBOS,**
**SERGIO GUERRA, and**
**GUADALUPE GARCIA**

did knowingly and intentionally possess with the intent to distribute more than 100 kilograms,

but less than a 1000 kilograms of marijuana, that is, approximately 572 kilograms of marijuana,

a Schedule I Controlled Substance.

In violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B) and

Title 18, United States Code, Section 2.

**Count Seventeen**

On or about April 30, 2000, in the Southern District of Texas and within the jurisdiction

of the Court, defendants

**JUAN LOZANO,**
**JOSE MARIO TELLEZ,**
**MARIO VALDEZ,**
**GERARDO VALDEZ,**
(1/30/01) **NICOLAS GONZALEZ, JR.,**
**SANTIAGO VELA,**
**ROLANDO VILLALOBOS,**
**SERGIO GUERRA, and**
**GUADALUPE GARCIA**

did knowingly and intentionally possess with the intent to distribute more than 100 kilograms,

but less than a 1000 kilograms of marijuana, that is, approximately 925 kilograms of marijuana,

a Schedule I Controlled Substance.

In violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B) and

Title 18, United States Code, Section 2.

## Count Eighteen

On or about July 13, 2000, in the Southern District of Texas and within the jurisdiction of the Court, defendants

### JUAN LOZANO,
### JOSE MARIO TELLEZ, and
### MARIO VALDEZ

did knowingly and intentionally possess with the intent to distribute more than 100 kilograms, but less than a 1000 kilograms of marijuana, that is, approximately 625 kilograms of marijuana, a Schedule I Controlled Substance.

In violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B) and Title 18, United States Code, Section 2.

## Count Nineteen

On or about July 18, 2000, in the Southern District of Texas and within the jurisdiction of the Court, defendant

### RAY PEREZ

did knowingly and intentionally possess with the intent to distribute more than 100 kilograms, but less than a 1000 kilograms of marijuana, that is, approximately 254 kilograms of marijuana, a Schedule I Controlled Substance.

In violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B) and Title 18, United States Code, Section 2.

B.

The real property , improvements and appurtenances located at Mile 2 West and Mile 12

North, being further described as five acres out of Lot 4, Block 99, Campacuas Addition

to the Capisallo District, Ilano Grande Grant, Hidalgo County, Texas

C.

The residence and real property located at 1016 Cherry Blossom, Weslaco, Texas being

further described as Lot 3, Block 9, Garden Terrace Subdivision, #2, an addition to the

City of Weslaco.

If any property forfeitable by Title 21, United States Code, Section 853(a), as a result of

any act or omission of any Defendant:

 (1)  cannot be located upon the exercise of due diligence;

 (2)  has been transferred or sold to a third person or entity;

 (3)  has been placed beyond the jurisdiction of the Court;

 (4)  has been substantially diminished in value; or

 (5)  has been commingled with other property which cannot be subdivided without

    difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to

seek forfeiture of any and all other property of said Defendants, including any property charged

above and determined not to be subject to forfeiture by 21, United States Code, Section 853(a),

as substitute assets for those properties whose forfeiture is impeded for the reasons (1), (2), (3),

(4), or (5) described above.

As a result of each of the foregoing violations of Title 18 Section 1956 of the United

States Code, defendants

## NOTICE OF FORFEITURE

As a result of the foregoing violations of Title 21, United States Code, Sections 846 or

841(a)(1), defendants

**JUAN LOZANO,
JOSE MARIO TELLEZ,
MARIO VALDEZ,
RAY PEREZ,
GERARDO VALDEZ,**
nal (1/30/01) **NICOLAS GONZALEZ, JR.,
ELOY SAENZ,
SANTIAGO VELA,
ROLANDO VILLALOBOS,
SERGIO GUERRA, and
GUADALUPE GARCIA,**

shall forfeit to the United States all of their interest in all property constituting or derived from

any proceeds the defendant obtained, either directly or indirectly, from the said violations, as well

as all of their interest in all property used or intended to be used in any manner to commit or to

facilitate the commission of the said violations, pursuant to Title 21, United States Code, Section

853(a), including but not limited to the following properties:

### United States Currency

$3,000,000

### Real Property

A.

The residence and real property located at 2114 9th St., Weslaco, Texas, being further

described as Lot 17, Jo-Lene Addition Unit No. 3, an addition to the City of Weslaco,

Hidalgo County, Texas as per map or plat thereof recorded in volume 30, Page 13, Map

Records, Hidalgo County Texas.

B.

The real property , improvements and appurtenances located at Mile 2 West and Mile 12 North, being further described as five acres out of Lot 4, Block 99, Campacuas Addition to the Capisallo District, Ilano Grande Grant, Hidalgo County, Texas

C.

The residence and real property located at 1016 Cherry Blossom, Weslaco, Texas being further described as Lot 3, Block 9, Garden Terrace Subdivision, #2, an addition to the City of Weslaco.

If any property forfeitable by Title 21, United States Code, Section 853(a), as a result of any act or omission of any Defendant:

(1)     cannot be located upon the exercise of due diligence;

(2)     has been transferred or sold to a third person or entity;

(3)     has been placed beyond the jurisdiction of the Court;

(4)     has been substantially diminished in value; or

(5)     has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any and all other property of said Defendants, including any property charged above and determined not to be subject to forfeiture by 21, United States Code, Section 853(a), as substitute assets for those properties whose forfeiture is impeded for the reasons (1), (2), (3), (4), or (5) described above.

As a result of each of the foregoing violations of Title 18 Section 1956 of the United States Code, defendants

JUAN LOZANO,
MARIVEL ~~MARIBEL~~ LOZANO,
JOSE MARIO TELLEZ,
ROSA MARIA TELLEZ
also known as Maria Tellez
MARIO VALDEZ,
ROSA AMELIA VALDEZ,
RAY PEREZ,
GERARDO VALDEZ,
(1/30/01)   NICOLAS GONZALEZ,  JR.,
ROLANDO VILLALOBOS,
SERGIO GUERRA,
GUADALUPE GARCIA, and
RUMALDO LOZANO

shall forfeit to the United States all of their interest in all property involved in or traceable to

such an offense including but not limited to the following properties:

## United States Currency

$3,000,000

## Real Property

### A

The residence and real property located at 2114 9th St., Weslaco,  being further described

as Lot 17,  Jo-Lene Addition Unit No. 3, an addition to the City of Weslaco, Hidalgo

County, Texas as per map or plat thereof recorded in volume 30, Page 13, Map Records,

Hidalgo County Texas.

### B.

The real property , improvements and appurtenances located at Mile 2 West and Mile 12

North, being further described as five acres out of Lot 4, Block 99, Campacuas Addition

to the Capisallo District, Ilano Grande Grant, Hidalgo County, Texas.

C.

The residence and real property located at 1016 Cherry Blossom, Weslaco, Texas being

further described as Lot 3, Block 9, Garden Terrace Subdivision, #2, an addition to the

City of Weslaco.

If any property forfeitable by Title 18, United States Code, Section 982(a)(1), as a result

of any act or omission of any Defendant:

(1)     cannot be located upon the exercise of due diligence;

(2)     has been transferred or sold to a third person or entity;

(3)     has been placed beyond the jurisdiction of the Court;

(4)     has been substantially diminished in value; or

(5)     has been commingled with other property which cannot be subdivided without

difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b)(1),

to seek forfeiture of any and all other property of said Defendants, including any property

charged above and determined not to be subject to forfeiture by 18, United States Code, Section

982(a)(1), as substitute assets for those properties whose forfeiture is impeded for the reasons (1),

(2), (3), (4), or (5) described above.

A TRUE BILL

FOREPERSON

MERVYN M  MOSBACKER
UNITED STATES ATTORNEY

ASSISTANT UNITED STATES ATTORNEY

TRUE COPY I CERTIFY
ATTEST:
MICHAEL N ,MILBY, CLERK
By
Deputy Clerk

AO 442 (12/85)  Warrant for Arrest

# United States District Court
## SOUTHERN DISTRICT OF TEXAS

**SEALED**

UNITED STATES OF AMERICA

V.

## JOSE MARIO TELLEZ

**WARRANT FOR ARREST**

**CASE NUMBER:** M-00-439

To:    The United States Marshal
and any Authorized United States Officer

YOU ARE HEREBY COMMANDED to arrest_____ **JOSE MARIO TELLEZ**_____

Name

and bring him forthwith to the nearest magistrate to answer a(n) ☒ Indictment charging him with (brief description of offense)

COUNT 1  Conspiracy to possess with intent to distribute more than 5 kilograms of cocaine. Title 21, United States Code, Sections 846, 841(a)(1) and 841(b)(1)(A); COUNT 2:  Conspiracy to possess with intent to distribute more than 1000 kilograms of marijuana. Title 21, United States Code, Sections 846, 841(a)(1) and 841(b)(1)(A), COUNT 3  Laundering of Monetary Instruments with the intent to promote the carrying of specific unlawful activity. Title 18, United States Code. Section 1956(h); COUNT 6:  Possession with intent to distribute more than 5 kilograms of cocaine, that is, approximately 470 kilograms, of cocaine Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A) and Title 18, United States Code, Section 2; COUNT 9  Possession with intent to distribute less than 50 kilograms of marijuana, that is, approximately 41 kilograms of marijuana. Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(D) and Title 18, United States Code, Section 2; COUNT 10:  Possession with intent to distribute more than 100 kilograms of marijuana but less than 1000 kilograms of marijuana, that is, approximately 159 kilograms of marijuana. Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B) and Title 18, United States Code, Section 2; COUNT 11:  Laundering of Monetary Instruments with the intent to promote the carrying of specific unlawful activity ($40,000). Title 18, United States Code, Section 1956(a)(1)(A)(I) and Section 2; COUNT 12: Laundering of Monetary Instruments with the intent to promote the carrying of specific unlawful activity ($20,000). Title 18, United States Code, Section 1956(a)(1)(A)(I) and Section 2; COUNT 13  Laundering of Monetary Instruments with the intent to promote the carrying of specific unlawful activity ($50,000). Title 18, United States Code, Section 1956(a)(1)(A)(I) and Section 2; COUNT 14: Laundering of Monetary Instruments with the intent to promote the carrying of specific unlawful activity ($44,500). Title 18, United States Code, Section 1956(a)(1)(A)(I) and Section 2; COUNT 15:  Possession with intent to distribute more than 100 kilograms but less than 1000 kilograms of marijuana, that is, approximately 619 kilograms of marijuana. Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B) and Title 18, United States Code, Section 2; COUNT 16.  Possession with intent to distribute more than 100 kilograms of marijuana but less than 1000 kilograms of marijuana, that is, approximately 572 kilograms of marijuana Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B) and Title 18, United States Code, Section 2; COUNT 17:  Possession with intent to distribute more than 100 kilograms of marijuana but less than 1000 kilograms of marijuana, that is, approximately 925 kilograms of marijuana Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B) and Title 18, United States Code, Section 2; COUNT 18:  Possession with intent to distribute more than 100 kilograms but less than 1000 kilograms of marijuana, that is, approximately 625 kilograms of marijuana. Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B) and Title 18, United States Code, Section 2.

in violation of Title _____ United States Code, Section(s) _____

MICHAEL N. MILBY.
Name of Issuing Officer

CLERK, U. S. DISTRICT COURT
Title of Issuing Officer

AUGUST 29, 2000 - McAllen, Texas
Signature of Issuing Officer          Date and Location

Bail fixed at $  NO BOND          by HON. FELIX RECIO, U. S. MAGISTRATE JUDGE
Name of Judicial Officer

| RETURN |
|---|
| This warrant was received and executed with the arrest of the above-named defendant at _____ |

| DATE RECEIVED | NAME AND TITLE OF ARRESTING OFFICER | SIGNATURE OF ARRESTING OFFICER |
|---|---|---|
| DATE OF ARREST | | |

**GOVERNMENT EXHIBIT**
C

TRUE COPY I CERTIFY
ATTEST:
MICHAEL N. MILBY, CLERK
By _____
Deputy Clerk



ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
McALLEN DIVISION

United States District Court
Southern District of Texas
FILED

JUN - 4 2001

Michael N. Milby, Clerk of Court

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO:  CR M-00-440 |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| vs. | ) | |
| | ) | McAllen, Texas |
| MARIO MARTINEZ, | ) | Monday, May 21, 2001 |
| | ) | (2:22 to 4:25 p.m.) |
| Defendant. | ) | |

JURY TRIAL (DAY 2)
(PARTIAL TRANSCRIPT OF PROCEEDING)
(TESTIMONY OF FRANCISCO GUEVARA (SEBASTIAN) ONLY)

BEFORE THE HONORABLE RICARDO H. HINOJOSA,
UNITED STATES DISTRICT JUDGE

Appearances:

For the Government:        (See next page)

For the Defendant:         (See next page)

GOVERNMENT
EXHIBIT
D

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

EXCEPTIONAL REPORTING SERVICES

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
McALLEN DIVISION

United States District Court
Southern District of Texas
FILED

JUN - 4 2001

Michael N. Milby, Clerk of Cou

UNITED STATES OF AMERICA,      )      CASE NO:   CR M-00-440
                               )
              Plaintiff,       )          CRIMINAL
      vs.                      )
                               )       McAllen, Texas
MARIO MARTINEZ,                )      Monday, May 21, 2001
                               )        (2:22 to 4:25 p.m.)
              Defendant.       )
_____

JURY TRIAL (DAY 2)
(PARTIAL TRANSCRIPT OF PROCEEDING)
(TESTIMONY OF FRANCISCO GUEVARA (SEBASTIAN) ONLY)

BEFORE THE HONORABLE RICARDO H. HINOJOSA,
UNITED STATES DISTRICT JUDGE

Appearances:

For the Government:       (See next page)

For the Defendant:        (See next page)

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

EXCEPTIONAL REPORTING SERVICES

2

**APPEARANCES:**


For the Government:          PATRICIA PROFIT, ESQ.
                            Assistant United States Attorney
                            1701 W. Business Highway 83
                            Suite 600
                            McAllen, Texas 78501

For the Defendant:          FERNANDO MANCIAS, ESQ.
                            2408 N. CONWAY
                            Mission, TX 78572

Official Interpreter:       Jonathan Gonzalez

Court Recorder:             Antonio E. Tijerina

Transcriber:                Mary Henry
                            Exceptional Reporting Services
                            P.O. Box 61850
                            Houston, Texas 77208
                            713 670-7774

3

## INDEX

| WITNESS FOR THE GOVERNMENT: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Francisco Guevara (Sebastian) | 4 | 41 | 42 | -- |

| GOVERNMENT EXHIBITS: | RECEIVED |
|---|---|
| Number   6 | 21 |
| Number  94 | 15 |
| Number  95 | 11 |
| Number  96 | 19 |
| Number  97 | 28 |
| Number  98 | 14 |
| Number  99 | 28 |
| Number 100 | 14 |
| Number 101 | 27 |
| Number 102 | 26 |
| Number 103 | 10 |
| Number 104 | 8 |
| Number 105 | 13 |
| Number 106 | 12 |
| Number 107 | 23 |

1      <u>**McAllen, Texas; Tuesday, May 21, 2001; 1:44 p.m.**</u>

2           **(Entire proceeding recorded; partially transcribed)**

3           **(Official Court Interpreter present in courtroom)**

4                          **(Jury present)**

5      **(Witness sworn)**

6           **THE COURT:**  Go ahead and have a seat up here.

7           Mr. Guevara, you will be testifying through an

8      interpreter.  Please remember that he is not asking the

9      questions, either one of the attorneys or I will be doing that.

10          So, when you respond, pause sufficiently so the

11     interpreter can have enough time to interpret what you are

12     saying, and address your response directly to the person asking

13     the question and not to the interpreter.

14          Go ahead, Ms. Profit.

15                         **DIRECT EXAMINATION**

16          **(Testimony translated by Official Court Interpreter)**

17     **BY MS. PROFIT:**

18     Q    Could you state your full name for the record, please?

19     A    Sebastian Martinez Fernando.

20     Q    And that means --

21          **THE COURT:**  Fernando?

22          **THE WITNESS:**  Yes.

23          **THE COURT:**  Did you say Guevara when you called out

24     his name?

25          **GOVERNMENT AGENT:**  Excuse me, Judge.  We can --

1          **THE COURT:**  Do we have the wrong person here?

2          **MS. PROFIT:**  No, your Honor.  We have the right

3     person and we will explain the different names and how he's

4     come to use them.  He has --

5          **THE COURT:**  Okay.  You're saying that your name is

6     Sebastian Martinez Fernando; is that correct?

7          **THE WITNESS:**  Yes, it's correct.

8          **THE COURT:**  And you're going to have to speak as

9     close as you can to the microphone and as loudly as you can

10    because the very last juror has to be able to hear you.

11         So, move up the microphone a little bit closer.

12         Why don't you help him with that?

13         Go ahead.

14    **BY MS. PROFIT:**

15    Q    Now, Mr. Sebastian, is "Sebastian" your father's name?

16    A    Yes.

17    Q    And "Martinez" is your mother's name?

18    A    Yes.  It's true.

19    Q    Now, when did you first come to the United States?

20    A    In February of '96.

21         **THE COURT:**  So, your name is Fernando Sebastian-

22    Martinez; is that right?

23         **THE WITNESS:**  Yes, that's right.

24    //

25    //

1  **BY MS. PROFIT:**

2  Q    Now, when you came to the United States, did you get some

3  false documents?

4  A    Yes.

5  Q    And in what name -- what names did you get those false

6  documents?

7  A    Mauricio Guevara.

8  Q    And how did you get that -- I mean, how did you get it on

9  the street?

10  A    On the streets I asked for them to make me a social

11  security number.

12  Q    Now, did you also come to use the name, Cuevara,

13  C-u-e-v-a-r-a?

14          **THE COURT:**  Did you say, "G" or "C"?

15          **MS. PROFIT:**  "C"-u-e-v-a-r-a.

16          **THE COURT:**  Are you sure?  With a "C"?

17          **MS. PROFIT:**  Yes, your Honor.  There's been two

18  spellings of this, both with a "C" and with a "G", your Honor.

19          **THE WITNESS:**  Yes, it's true.

20  **BY MS. PROFIT:**

21  Q    And how did you come to use that?

22  A    Because I started working at a factory with my real name

23  and they fired me.  I only worked one week.

24          **THE COURT:**  You need to speak up louder,

25  Mr. Sebastian, if you don't mind, please.

1           **THE WITNESS:**  And they fired me, so I had to look for

2    another name.

3    **BY MS. PROFIT:**

4    Q     And did --

5    A     That's how I got this name, the one of Mauricio Guevara.

6    Q     And then how did you get the name, "Frank Cuevara"?

7    A     The same.  The same way as Mauricio Guevara.

8    Q     Which means that you did what?

9    A     The same.  I obtained a social security number on the

10   streets.

11   Q     Now, do you -- are you also known by a nickname?

12   A     Yes, that's right.

13   Q     And what is that nickname?

14   A     They call me, "Chilango."

15   Q     And what does that mean as a nickname?

16   A     To the people that were born where I was, that's what they

17   tell them -- call them.

18   Q     And where were you born?

19   A     In the city of Mexico.

20   Q     Now, Mr. Sebastian, how many years of education did you

21   have before you left Mexico?

22   A     13 to 14 years.

23   Q     And why did you originally come to the United States?

24   A     For a better future and to earn money.

25   Q     Now, did you come to meet an individual by the name of

1   Hugo Perez?

2   A     Yes, it's true.

3   Q     And how did you come to meet this individual by the name

4   of Hugo Perez?

5   A     In a factory where I was working, a person hooked me up

6   with him.

7   Q     And who was the name -- what was the name of the person

8   that hooked you up with him?

9   A     Geraldo was his name.

10            **MS. PROFIT:**  May I approach, your Honor?

11            **THE COURT:**  Go ahead.

12  **BY MS. PROFIT:**

13  Q     Can you identify this photograph?

14  A     Yes.

15            **MS. PROFIT:**  Your Honor, I'm going to move for

16  admission of Government's Exhibit 104.

17            **MR. MANCIAS:**  No objection, Judge.

18            **THE COURT:**  Government's Number 104 is admitted.

19       **(Government's Exhibit Number 104 was received in evidence)**

20  **BY MS. PROFIT:**

21  Q     You've indicated that you can identify this -- the

22  individual in this photograph.  Who is this individual?

23  A     Hugo Perez.

24  Q     Now, what did Hugo Perez ask you to do?

25  A     He asked me to go to Ohio for 300 pounds of marijuana.

Guevara - Direct                                    9

1    Q    Do you remember approximately when this was?

2    A    In April of '99.

3    Q    Now, what were you supposed to be doing with this

4    marijuana?

5    A    Take it to the city of Chicago.

6    Q    And what was going to happen to it there?

7    A    From there we were going to take it to the state of

8    Michigan.

9    Q    And do you know who you were going to be taking it to in

10   the state of Michigan?

11   A    Hugo asked me to take 100 pounds to a person they called

12   "Borris."

13   Q    Now, how much did you get paid for doing that?

14   A    About $1,500.

15   Q    Now, is that the only time that Hugo Perez asked you to

16   transport some marijuana?

17   A    No.

18   Q    Did he ask you on several other occasions to transport

19   marijuana?

20   A    Yes, it's true.

21   Q    Did he also ask you to help him in unloading marijuana?

22   A    Yes, that's right.

23   Q    Do you recall approximately how many times this occurred?

24   A    About seven or eight occasions.

25   Q    Now, do you recall some of the individuals that you dealt

1    with in terms of this marijuana?

2    A    Yes, I remember.

3    Q    Who did you receive marijuana from?

4    A    I received marijuana from a person that came from here,

5    from Texas.  They called him, "Betin."

6    Q    I'm going to show you what has been marked for

7    identification as Government's Exhibit 103.

8         Can you identify that photograph?

9    A    Yes.

10        **MS. PROFIT:**  Your Honor, I'm going to move for the

11   identification -- for the admission of Government's

12   Exhibit 103.

13        **MR. MANCIAS:**  No objection.

14        **THE COURT:**  Government's Number 103 is admitted.

15        **(Government's Exhibit Number 103 was received in evidence)**

16   **BY MS. PROFIT:**

17   Q    On this -- I've put number 103, Government's Exhibit 103

18   on the projector.  Who -- you said that you can identify this

19   photograph.  Who is this individual?

20   A    Betin.

21   Q    Now, how did you meet Mr. Betin?  Betin?

22   A    When we were going to unload a trailer.

23   Q    And how much marijuana was in the trailer that you were

24   going to unload?

25   A    1,000 pounds.

Guevara - Direct                                          11

1  Q    Did you later learn that this Mr. -- that Betin was

2  Alberto Gonzalez?

3  A    Yes, it's true.

4  Q    Did you -- was that the only time or were there other

5  occasions where Alberto Gonzalez or Betin helped you unload

6  marijuana?

7  A    It was the only time.

8  Q    Was there anyone else that you dealt with?

9  A    Yes, afterwards about a month or a month and a half later.

10 Q    And who was that individual?

11 A    (No audible response).

12      **(Pause)**

13      **MS. PROFIT:**  May I approach the witness, your Honor?

14      **THE COURT:**  Sure.

15      **MS. PROFIT:**  I'm going to show you what's been marked

16 for identification as Government's Exhibit 95.

17      Can you identify the individual in that photograph?

18      **THE WITNESS:**  Yes, I can identify.

19      **MS. PROFIT:**  I'm going to move for the admission of

20 Government's Exhibit 95, your Honor.

21      **MR. MANCIAS:**  No objection.

22      **THE COURT:**  It's admitted.

23      **(Government's Exhibit Number 95 was received in evidence)**

24 //

25 //

**EXCEPTIONAL REPORTING SERVICES**

Guevara - Direct                                   12

1    **BY MS. PROFIT:**

2    Q     You've indicated that you can identify the individual in

3    Government's Exhibit 95.   Who is that person?

4    A     They call him "Nico."

5    Q     Did you later learn that his name was Nicholas Gonzalez?

6    A     Yes.

7    Q     And how did you know Nicholas Gonzalez?

8    A     Unloading a trailer.

9    Q     And when you were unloading that trailer, what was in the

10   trailer?

11   A     There was approximately 1,000 pounds of marijuana.

12   Q     Now, I'm going to show you what's been marked for

13   identification as Government's Exhibit 106.

14         Can you identify this individual?

15   A     Yes.

16         **MS. PROFIT:**   Your Honor, I'm going to move to for

17   admission of Government --

18         **THE COURT:**   Is there any objection to 106,

19   Mr. Mancias?

20         **MR. MANCIAS:**   No objection, Judge.

21         **THE COURT:**   Government's Number 106 is admitted.

22    **(Government's Exhibit Number 106 was received in evidence)**

23   **BY MS. PROFIT:**

24   Q     Can you identify for us who is in Government's 106?

25   A     Yes.   His name is Guadalupe, Jr.   He was -- yes,

1   Guadalupe, Jr.

2   Q     And how did you know Guadalupe, Jr.?

3   A     Because he has a dad who has the same name.

4   Q     I'm going to show you what's been marked for

5   identification as Government's Exhibit 105.  Can you identify

6   that individual?

7   A     Yes.

8         **MS. PROFIT:**  Your Honor, I'm going to move for

9   admission of Government --

10        **THE COURT:**  Any objection, Mr. Mancias?

11        **MR. MANCIAS:**  No objection.

12        **THE COURT:**  Government's Number 105 is admitted.

13        **(Government's Exhibit Number 105 was received in evidence)**

14  **BY MS. PROFIT:**

15  Q     Can you identify for us who's in Government's Exhibit 105?

16  A     It's Guadalupe Alvarez.

17  Q     When you indicated that Guadalupe Alvarez, Jr. has a papa,

18  is this the man that you were talking about?

19  A     That's right, yes.

20  Q     And how do you know Guadalupe Alvarez, Sr.?

21  A     Because I would take him marijuana.

22  Q     Now, do you know where he lived?  Where did you take it?

23  A     To Lansing, Michigan.

24  Q     Can you identify the individual -- I'm showing you what's

25  been marked for identification as Government's Exhibit 98.  Can

1   you identify the person that's in that photograph?

2   A    Yes.

3            MS. PROFIT:  Your Honor, I'm going to move --

4            THE COURT:  Is there any objection to Number 98?

5            MR. MANCIAS:  No objection.

6            THE COURT:  Government's Number 98 is admitted.

7        **(Government's Exhibit Number 98 was received in evidence)**

8   **BY MS. PROFIT:**

9   Q    You've indicated that you can identify this individual.

10  Who is this individual?

11  A    Mario Tellez.

12  Q    I'm going to show you what's been marked for

13  identification as Government's Exhibit 100.

14           Can you identify the person in that exhibit?

15  A    Yes.

16           MS. PROFIT:  Your Honor, I'm going to move --

17           THE COURT:  Is there any objection, Mr. Mancias?

18           MR. MANCIAS:  No objections.

19           THE COURT:  Government's Number 100 is admitted.

20       **(Government's Exhibit Number 100 was received in evidence)**

21  **BY MS. PROFIT:**

22  Q    Who is the individual that is in Government's Exhibit 100?

23  You've indicated you can identify him.

24  A    Mario.  I don't remember his last name.

25  Q    I'm going to show you what's been marked for

Guevara - Direct                    15

1   identification as Government's Exhibit 94.  Can you identify

2   that individual?

3   A    Yes.

4           **MS. PROFIT:**  Your Honor, I'm going to --

5           **THE COURT:**  Any objection, Mr. Mancias?

6           **MR. MANCIAS:**  No objection.

7           **THE COURT:**  It's admitted.

8       **(Government's Exhibit Number 94 was received in evidence)**

9   **BY MS. PROFIT:**

10  Q    Can you identify who this individual is?

11  A    Yes.

12  Q    Who is this individual?

13  A    It's Mario's son, the person you just showed me.

14  Q    This is the son of Mario Valdez?

15  A    He's the son of the person, the last person that you

16  showed me.

17          **THE COURT:**  Mario Valdez or Mario Tellez?

18          **THE WITNESS:**  Mario Valdez.

19  **BY MS. PROFIT:**

20  Q    When you say "the last person I showed you," I'm putting

21  up on this screen, Government's Exhibit 100.  Is that the

22  individual that you mean?

23  A    Yes, that's him.

24  Q    I have on the screen Government's Exhibit 100 and

25  Government's Exhibit 94.  And you're saying that the individual

**EXCEPTIONAL REPORTING SERVICES**

1   depicted in Government's Exhibit 94 is the son of the

2   individual depicted in Government's Exhibit 100 who is Mario?

3   A    Yes, they are.

4   Q    Now, could you explain how -- you had indicated that you

5   knew the individual in Government's Exhibit 98, Mario Tellez.

6   Could you explain to the jury how you know Mario Tellez?

7   A    Yes.

8   Q    How do you know him?

9   A    I met him with -- when we went to Ohio to pick up the

10  pounds.

11  Q    And how many pounds was that that you were picking up in

12  Ohio?

13  A    300.

14  Q    And what was Mario Tellez's role in -- when you picked up

15  the 300 pounds?

16  A    I just met him that he was with one guy, Hugo.  I didn't

17  know him before.

18  Q    When you say that "he was with this guy, Hugo," do you

19  mean Hugo Perez?

20  A    Yes.

21  Q    Did Hugo Perez later explain to you who he was?

22  A    Yes.

23  Q    And what did Hugo Perez tell you about Mario Tellez?

24  A    That he was his boss.

25  Q    Now, did you -- at other points in time, did you yourself

Guevara - Direct                                            17

1   have conversations with Mario Tellez?

2   A    Yes.

3   Q    And what kind of conversations did you have with Mario

4   Tellez?

5   A    I had a conversation when they detained Guadalupe --

6   Guadalupe Alvarez there in Michigan.

7   Q    And what was the nature of that conversation?

8   A    We were in Hugo's apartment and Guadalupe Alvarez called

9   me.  He told me that the load had fallen at his house.  Mario

10  heard and I told him what had happened, so he came to Texas.

11  Q    When you said that Mario Tellez came to Texas, this

12  conversation took place in Chicago?

13  A    Yes, that's right.

14  Q    Why did Mario Tellez come to Texas; do you know?

15  A    He was scared.

16  Q    Did you ever have any other additional conversations with

17  Mario Tellez?

18  A    Yes.

19  Q    What kind of conversations did you have with him?

20  A    About money.

21  Q    What kind of conversations did you have with him about

22  money?

23  A    He asked me to bring money to Texas.

24  Q    Did he do this on several occasions?

25  A    On three occasions.

1   Q    Do you recall the approximate dates that he asked you to

2   bring the money to Texas?

3   A    They were in the year of '99.

4   Q    Do you recall where you brought the money and how much the

5   money was?

6          THE INTERPRETER:  I'm sorry, counselor, is that

7   "where"?

8   BY MS. PROFIT:

9   Q    Do you recall where you brought the money?  Who did you

10  bring the money to?

11  A    Yes.

12  Q    The first time, where did you bring the money?

13  A    I brought it to Dallas.

14  Q    And who did you meet in Dallas?

15  A    Nico.

16  Q    When you say, "Nico" are you referring to Nicholas

17  Gonzalez?

18  A    Yes, that's right.

19  Q    And do you recall how much money you brought him?

20  A    $20,000.

21  Q    And what was that money from?

22  A    That Mario owed him.

23  Q    And when you say, "that Mario owed him" that money, what

24  did Mario owe him that money from?

25  A    From the time they went to unload in Chicago.

EXCEPTIONAL REPORTING SERVICES

1   Q     Now, how did you -- how did you get to Dallas?

2   A     I came in a bus, from the Rabbit line.

3   Q     In addition to Dallas, where else did you bring money from

4   Mario Tellez?

5   A     To Dallas also, for another person.

6   Q     I'm going to show you what's been marked for

7   identification as Government's Exhibit 96.

8         Can you identify that individual?

9   A     Yes.

10        **MS. PROFIT:**  Your Honor, I'm going to move for

11  admission of Government's 96.

12        **MR. MANCIAS:**  No objection.

13        **THE COURT:**  Government's Number 96 is admitted.

14        **(Government's Exhibit Number 96 was received in evidence)**

15  **BY MS. PROFIT:**

16  Q     You indicated that you could identify this individual.

17        Who is this individual?

18  A     Guadalupe.

19  Q     Is he the individual that you delivered the money to in

20  Dallas?

21  A     Yes.

22  Q     And do you recall -- have you subsequently learned that

23  his full name is Guadalupe Garcia?

24  A     Yes, that's right.

25  Q     Do you recall how much money you brought to Guadalupe

1   Garcia in Dallas?

2   A     Yes, I remember it.

3   Q     How much was it?

4   A     Approximately $44,000.

5   Q     Now, how did you know that it was approximately $44,000?

6   A     Because I was there when Hugo Perez was counting 'em.

7   Q     And this money came from Hugo Perez?

8   A     Hugo Perez gave me the money.

9   Q     Who gave you the instructions of who to meet in Dallas?

10  A     Hugo first, and then Mario.

11  Q     Now, had you also made a trip to San Antonio?

12  A     Yes, that's right.

13  Q     And when you made the trip to San Antonio, how did you get

14  to San Antonio?

15  A     On the same bus line, the Rabbit one.

16  Q     I'm going to show you what's been marked for

17  identification as Government's Exhibit 6.

18            Can you identify this document?

19  A     Yes.

20  Q     And does your name appear on this document?

21  A     Yes.

22            **MS. PROFIT:**  Your Honor, I'm going to move --

23            **THE COURT:**  Any objection, Mr. Mancias?

24            **MR. MANCIAS:**  There is none, Judge.

25            **THE COURT:**  Government Number 6 is admitted.

1      **(Government's Exhibit Number 6 was received in evidence)**

2    **BY MS. PROFIT:**

3    Q    Now, Government's Number 6, is that your name that appears

4    on the top?

5    A    Yes, it's a name that I used.

6    Q    And is this the bus line that you're referring to when you

7    talk in terms of using the Rabbit line?

8    A    Yes, it is.

9    Q    And is the date on this 2/27/2000; is that correct?

10   A    Yes, that's right.

11   Q    And is -- there's a destination, which was San Antonio?

12   A    Yes, that's true.

13   Q    Now, was this the bus ticket that you purchased in Chicago

14   to get to San Antonio?

15   A    I bought it in the city of Elgin.

16   Q    And where is Elton [sic] in relationship to Chicago?

17   A    Elgin is the city.

18   Q    Do you mean, Elgin, E-l-g-i-n?

19   A    Yes.

20   Q    Now, when you arrived in San Antonio, do you recall how

21   much money that you had?

22   A    Yes.

23   Q    How much?

24   A    It was approximately -- approximately $50,000.

25   Q    And how do you know that?

1   A     Because I was packaging them with Hugo Perez.

2   Q     Now, who did you meet in San Antonio?

3   A     With Mario Tellez and Mario Valdez.

4   Q     And where did they -- did they meet you at a particular

5   location?

6   A     In a hotel.

7   Q     Do you recall where the hotel was?

8   A     It was the Holiday Inn.

9   Q     And did you get the room, or did someone else have the

10  room?

11  A     They already had the room.

12  Q     Do you recall if that was where you threw away your bus

13  ticket?

14  A     Yes, I threw it away there.

15  Q     Now, when you met them in San Antonio, do you recall what

16  kind of vehicle they were driving?

17  A     They had a white truck.

18  Q     And do you recall anything else about the white truck that

19  they had?

20  A     They put the money into the white truck.

21  Q     Do you recall where they put the money in the white truck?

22  A     In the light -- the back light inside the cabin.

23  Q     And were you there when they did it?

24  A     Yes.

25  Q     Now, this money that you delivered to them, what was your

Guevara - Direct                                    23

1   understanding that the source of the money was?

2   A    It was the money that Hugo stored for the drug.

3   Q    When you say that, "It was the money that Hugo stored for

4   the drugs," what do you mean?

5   A    The sales that Hugo made.

6   Q    I'm going to show you what's been marked for

7   identification as Government's Exhibit 107.  Can you identify

8   the vehicle in Government's Exhibit 107?

9   A    Yes.

10  Q    And is that a fair and accurate representation of that

11  vehicle?

12  A    Yes.

13        **MS. PROFIT:**  Your Honor, I'm going to move for the

14  admission of Government's 107.

15        **THE COURT:**  Is there any objection to this?

16        **MR. MANCIAS:**  No objection, Judge.

17        **THE COURT:**  Government's Number 107 is admitted.

18     **(Government's Exhibit Number 107 was received in evidence)**

19        **MS. PROFIT:**  Which is a series of four photographs,

20  your Honor, of a particular --

21        **THE COURT:**  Right.  It's all on one sheet, but with

22  the same exhibit number.

23        **MS. PROFIT:**  Yes, your Honor.

24  //

25  //

1   BY MS. PROFIT:

2   Q    Could you -- you've indicated that you can identify this

3   vehicle.   Could you describe to the jury what this vehicle is?

4   A    What it is?

5   Q    Yes, what vehicle was that?   How did you come to see that

6   vehicle?

7   A    Because they were waiting for me where the bus dropped me

8   off with that truck.

9   Q    Then is this the truck that you observed them put the

10  money in the taillight?

11  A    Yes, that's it.

12  Q    In addition to -- when you went to San Antonio in February

13  of 2000 to meet with Mario Tellez and Mario Valdez, was there

14  anything else in addition to the money that you took with you?

15  A    Yes, there was something else.

16  Q    What else did you take with you?

17  A    There were some papers that he had asked me for.

18  Q    And when you say that, "There were papers that he had

19  asked you for," who did you mean by "he"?

20  A    Mario Tellez.

21  Q    And those papers -- what were those papers about?   What

22  did you understand that those papers were about?

23  A    It was about the load that had -- that had fallen on

24  Guadalupe Alvarez.

25  Q    And did you receive those papers from Guadalupe Alvarez?

1  A    Yes.

2  Q    And what do you recall about those papers?

3  A    It talked about the drugs that they had taken away from

4  him and the money that they had taken away from him at his

5  house.

6  Q    And when you -- did you deliver those papers to Mario

7  Tellez?

8  A    Yes, I handed it to him.

9  Q    Did he ever tell you why he needed those papers?

10 A    Yes, he did tell me.

11 Q    And what did he tell you?

12 A    That it was to justify to other people that they had lost

13 a load.

14 Q    Now, did he happen to tell you any of the other people,

15 identify any of the people that he -- that he worked for?

16 A    No.  He would separate himselfs [sic] for that -- separate

17 himself for that at times.

18 Q    When you say, "He would separate himself for that at

19 times," what do you mean?

20 A    He would make telephone calls with other people and I

21 guess he didn't want them to know that it was me or Hugo.

22 Q    Did he ever indicate to you, though, who he was working

23 for?

24 A    No.

25 Q    Excuse me.  I'm going to show you what's been marked as

1    Government's Exhibit 102.

2           Can you identify that individual?

3    A    Yes.

4           MS. PROFIT:  Your Honor, I'm going to move for the

5    admission of Government's 102.

6           THE COURT:  Any objection, Mr. Mancias?

7           MR. MANCIAS:  None.

8           THE COURT:  Government's Number 102 is admitted.

9        (Government's Exhibit Number 102 was received in evidence)

10   BY MS. PROFIT:

11   Q    I've put on the screen, Government's Exhibit 102.  You've

12   indicated that you can identify this person.  Who is this

13   person?

14   A    They would call him "Ernest."

15   Q    Ernest or Ernie?

16   A    Yes.

17   Q    Have you subsequently learned that this is Ernesto DeMoya?

18          THE COURT:  Ernesto Moya or DeMoya?

19          MS. PROFIT:  Excuse me, Ernesto Moya.

20          THE COURT:  Have you learned --

21          THE WITNESS:  Yes.

22   BY MS. PROFIT:

23   Q    I'm going to show you what's been marked for

24   identification as Government's 101.  Can you identify this

25   individual?

Guevara - Direct                                    27

1   A    Yes.

2         **MS. PROFIT:**  Your Honor, I'm going to move for the

3   admission of Government's --

4         **THE COURT:**  Any objection, Mr. Mancias?

5         **MR. MANCIAS:**  None.

6         **THE COURT:**  It's admitted.

7         **(Government's Exhibit Number 101 was received in evidence)**

8   **BY MS. PROFIT:**

9   Q    Can you identify the person in Government's Exhibit 101?

10  A    Yes.

11  Q    And Government's Exhibit 1 [sic], how do you know this

12  individual?

13        **THE COURT:**  101.

14  **BY MS. PROFIT:**

15  Q    101.

16  A    They would call him "La Mula," the mule.

17  Q    Did you learn that his name was Jose Davila?

18  A    Yes.

19  Q    I'm going to show you Government's Exhibit 99.  Can you

20  identify that individual?

21  A    Yes.

22        **MS. PROFIT:**  And --

23        **THE COURT:**  Any objection, Mr. Mancias?

24        **MR. MANCIAS:**  There's no objection, Judge.

25        **THE COURT:**  That's -- Number 99 is admitted.

1     **(Government's Exhibit Number 99 was received in evidence)**

2     **BY MS. PROFIT:**

3     Q    And Government's Exhibit 99, who is this individual?

4     A    El Guero.  He was always along with somebody that they

5     called "El Chago."

6     Q    I'm going to show you what's been marked for

7     identification as Government's Exhibit 97.

8          Can you identify that individual?

9     A    Yes.

10         **THE COURT:**  Any objection, Mr. Mancias?

11         **MR. MANCIAS:**  There is none, Judge.

12         **THE COURT:**  97 is admitted.

13    **(Government's Exhibit Number 97 was received in evidence)**

14    **BY MS. PROFIT:**

15    Q    In Government's Exhibit 97, you've indicated you can

16    identify this individual.  Who is he?

17    A    They called him "Chago."

18    **(Pause)**

19         **THE COURT:**  We'll take a short break here.

20         Please rise for the jury.

21    **(Jury exits)**

22         **THE COURT:**  We'll see you all in a few minutes.

23    **(A recess was taken from 3:13 to 3:41 p.m.)**

24    **(Jury enters)**

25         **THE COURT:**  Please be seated.

1           Go ahead, Ms. Profit.

2   **BY MS. PROFIT:**

3   Q    You had identified the individual in Government's

4   Exhibit 102 as "Ernie" or Ernesto Moya.  Could you tell the

5   jury what Ernie's role was?  What did Mr. Moya do?

6   A    Yes.

7   Q    What did he do?

8   A    He unloaded with Betin, that time that Betin unloaded.

9   Q    This individual that you've identified as, I believe,

10  "Guero"?

11  A    Yes.

12  Q    What was his role?

13  A    He unloaded with Chago one time.

14  Q    Was it just on one occasion or could it have been more

15  than one occasion?

16  A    He unloaded once.  And then another time, they were going

17  to go deliver 2,000 pounds to -- well, they were involved in

18  that also.

19  Q    Did they just deliver marijuana or did they also deliver

20  cocaine?

21  A    Cocaine.

22  Q    Now, did you ever talk -- did Mario Tellez ever talk to

23  you about an individual by the name of Juan?

24  A    He would just talk to me about a certain Juan, but I never

25  met him.

Guevara - Direct                                      30

1   Q    Did he indicate to you that Juan was the source of supply?

2   A    Yes.

3   Q    Did he -- this Juan, also have a lot of other nicknames?

4   "El Coqueto"?  Was that one of the phrases that Mr. Tellez used

5   for him?

6        **THE INTERPRETER:**  I'm sorry, counselor.  Could you

7   repeat that?

8   **BY MS. PROFIT:**

9   Q    Did Mr. Tellez refer to him as "El Coqueto"?

10  A    Yes.

11  Q    Did he also refer to him as "El Negro"?

12  A    Yes, also.

13  Q    And did he refer to him as "El Primo"?

14  A    Yes, also.

15       **(Pause)**

16  Q    Now, Mr. Sebastian, I met with you on Saturday; did I not?

17  A    Yes.

18  Q    And at that time did I play a tape for you?

19  A    Yes.

20  Q    And did you have occasion to listen to it?

21  A    Yes.

22  Q    And were you able to identify the voices on the tape?

23  A    Yes.

24  Q    And did you identify your voice on the tape?

25  A    Yes, that's right.

1          **MS. PROFIT:**  Your Honor, I'm going to play what has

2   been admitted as Government's Exhibit 24 at this time.

3          **THE COURT:**  Okay.  And that is what?

4          **MS. PROFIT:**  Government's Exhibit 24 is a

5   conversation between Mario Tellez and Francisco Guevara that

6   took place on February 26, 2000.

7          **THE COURT:**  Francisco Guevara being this individual?

8          **MS. PROFIT:**  Yes, your Honor.  This is one of the

9   names that he has used.  The government identified him as

10  Francisco Guevara at the time.  And --

11         **THE COURT:**  Okay.  So, we need to say it's a

12  conversation between Mario Tellez and Mr. Sebastian --

13         **MS. PROFIT:**  Yes, your Honor.

14         **THE COURT:**  -- using the name Francisco Guevara at

15  the time.

16         **MS. PROFIT:**  Or having been identified at the time by

17  the government as Francisco Guevara.

18         And your Honor, we have transcripts of that

19  conversation.

20         **THE COURT:**  Okay.  And how long is this conversation?

21         **MS. PROFIT:**  This conversation is not very long, your

22  Honor.  It's approximately a minute, two minutes --

23         **THE COURT:**  Okay.  Well, let's --

24         **MS. PROFIT:**  Four minutes, excuse me.  I've been

25  corrected.

1          **THE COURT:**  How many?

2          **MS. PROFIT:**  Four.

3          **THE COURT:**  Okay.  Go ahead and pass out the

4    transcripts.

5              And ladies and gentlemen, you remember the

6    instructions I gave you about these transcripts.

7              Let's get on with it, Ms. Profit.

8          **MS. PROFIT:**  Yes, your Honor.

9          **THE COURT:**  And you have two agents here.  They can

10   help you.  I mean -- there're not here -- the reason they're

11   given permission to escape the rule here is so that they can

12   sit here and help you, and consult with you during this process

13   here.  Other than that, they'd have to wait outside.

14       **(Pause)**

15             Did you have one for the Court?

16         **MS. PROFIT:**  Oh, I'm sorry, your Honor.

17         **THE COURT:**  And I am going to ask the interpreter if

18   he sees any -- the Court Interpreter here, if he sees anything

19   that's interpreted incorrectly, just stand up and say so.

20             Do you have an extra copy for him?

21             Mr. Velasco, just go hand it to him.  She's busy

22   here.

23       **(Pause)**

24         **THE COURT:**  Are you ready to play this?

25       **(Discussion off the record)**

1          (Government's Tape Exhibit 24 was played before the jury)

2     BY MS. PROFIT:

3     Q     Now --

4              THE COURT:  Go ahead.

5     BY MS. PROFIT:

6     Q     Mr. Sebastian --

7              THE COURT:  And ladies and gentlemen, if you all

8     don't mind sending those transcripts to the first juror at the

9     end of the line here.

10    BY MS. PROFIT:

11    Q     Now, what are you discussing in terms of this -- on this

12    -- with this telephone conversation?  First, who were you

13    speaking to?

14    A     With Mario Tellez.

15    Q     And what were you talking to him about?

16    A     He was asking me about the papers, about when Guadalupe

17    Alvarez had lost his load.

18    Q     And what was -- did you use a code word for that?

19    A     Yes.

20    Q     And what was the code word?

21    A     Well, I told him that "those things" -- in other words,

22    "those things" that he had inside his house.  I was talking

23    about the drug and the money.

24    Q     What other instances did you use code in that

25    conversation?

1  A    I don't remember.

2  Q    Now, were you making arrangements with Mr. Tellez to do

3  something?

4  A    I was.  In that conversation he also told me about a car

5  that he wanted for me to fix.

6  Q    When you're talking in terms of "did you make

7  arrangements" was this before you left for -- to deliver the

8  papers to him?

9  A    Yes, that's right.

10 Q    And when you were -- was he also asking you about other

11 things other than those papers that you were supposed to bring

12 with you?

13 A    Yes.

14 Q    What else was he asking you about?

15 A    That what was happening with the rest of the money that

16 was in those papers, that that wasn't all, but I was telling

17 him about.

18 Q    What do you mean that that wasn't all that you were

19 telling him about?

20 A    Because Guadalupe Alvarez owed more money.  And when they

21 caught him, he didn't tell me anything more about that.

22 Q    So, Mario Tellez was asking you how much money was seized?

23 A    Yes, he asked me.

24 Q    And was he trying to figure out if it totaled up to all of

25 Guadalupe Alvarez's money?

**EXCEPTIONAL REPORTING SERVICES**

1    A    Yes.

2    Q    Now, was it after this conversation that you got the bus

3    ticket to go to San Antonio?

4    A    Yes.

5    Q    And was it at this -- and that was the trip that you made

6    with some additional money that you got from Hugo Perez,

7    correct?

8    A    Yes, that's right.

9          **MS. PROFIT:**  Your Honor, we have another tape that we

10   would like to play.

11         **THE COURT:**  Go ahead.  This would be exhibit number

12   what?

13         **MS. PROFIT:**  This would be Government's Exhibit

14   Number 27, your Honor, which is a tape of a conversation

15   between Mr. Sebastian -- another conversation between

16   Mr. Sebastian and Mario Tellez that took place on March 20th.

17         **THE COURT:**  Of?

18         **MS. PROFIT:**  Of 2000, excuse me.

19         **THE COURT:**  Okay.  Are you passing out the transcript

20   now?

21         **MS. PROFIT:**  Yes, your Honor.

22         **THE COURT:**  Okay.  Go ahead and play it then.

23         **MS. PROFIT:**  We need to get one to the Court.

24         **THE COURT:**  And for the record we can agree here that

25   the references in this transcript to Mr. Guevara are references

1   to Mr. Sebastian?

2            **MS. PROFIT:**  Yes, your Honor.

3            **THE COURT:**  Is that right, Mr. Mancias?

4            **MR. MANCIAS:**  We'll agree to that.

5            **THE COURT:**  Okay.

6       **(Government's Tape Exhibit 27 was played before the jury)**

7            **THE COURT:**  If you all don't mind passing that

8   transcript down, ladies and gentlemen.

9            Go ahead.

10  **BY MS. PROFIT:**

11  Q    Now, Mr. Sebastian, what was this conversation about?

12  A    About some money that I had to take into Dallas.

13  Q    And you testified earlier about this money, did you not?

14  A    Yes.

15  Q    And this was money that you were going to be delivering to

16  who, if you recall?

17  A    To Guadalupe.

18  Q    And this is the individual in Government's Exhibit 96,

19  correct?

20  A    Yes.

21  Q    And so this was the individual that you were discussing on

22  the tape; is that correct?

23  A    Yes, that's right.

24  Q    And this is the person that Mario Tellez was directing you

25  to meet?

Guevara - Direct                    37

1   A    That's right.

2   Q    And you did, in fact, meet with him; did you not?

3   A    Yes.

4        **(Pause)**

5   Q    Now, you had identified this person earlier as Jose

6   Davila, correct?

7   A    As "La Mula".  And then afterwards I found out that was

8   his name.

9   Q    Now, did you describe -- what did -- what did he do?

10  A    He went to talk to Hugo one time that he had 200 pounds.

11  Hugo told me to take him to Guadalupe Alvarez over in Michigan.

12  Guadalupe Alvarez sold them and I brought Hugo and him the

13  money.

14  Q    And how much money was that?

15  A    It was about -- about $80,000.

16  Q    Now, you were arrested in Chicago; were you not?

17  A    Yes.

18  Q    Would you tell the jury how you came to be arrested in

19  Chicago and who you were arrested with?

20  A    Yes.

21  Q    Do you recall approximately when you were arrested?

22  A    It was April 3rd around 10:00 at night.

23  Q    And where were you arrested?

24  A    In a truck stop in Joliet.

25  Q    Now, who else was arrested with you?

1   A     Eutemio Garza.

2   Q     Now, how did you know Eutemio Garza?

3   A     Because Hugo told me to go get him at the airport.

4   Q     And did you understand why you were picking him up?

5   A     Yes.

6   Q     And what reason was that?

7   A     Because he knew the trucker that had the drug in the -- in

8   the semi.

9   Q     And what did you do when you picked him up?

10  A     I took him to a hotel and he stayed there for a day.   Then

11  I went to go get him the next day and we went to the truck stop

12  for the semi.

13  Q     Did you -- did you get to see the truck at the truck stop?

14  A     No.

15  Q     What happened when you got to the truck stop?

16  A     Eutemio was there talking to a person.   I think it's the

17  trucker.   And he was telling him that it was going.   It was

18  going, but it never arrived.

19  Q     When you said that he was talking to a person and that you

20  think it was the trucker, was Eutemio using a telephone?   Is

21  that what you mean?

22  A     Yes, he was talking on his cell phone.

23  Q     And when you -- what happened when you finally -- you said

24  that the truck never arrived, but what happened?

25  A     The state agents arrived and they detained us.

1   Q    And what happened to you after that?

2   A    They asked us if we were waiting for somebody.  They

3   already knew everything.

4   Q    And after that -- after they detained you, what happened?

5   A    They took us to a detention and we saw the trucker there

6   with a woman.

7   Q    Did you ever learn the name of the truck driver?

8   A    In court, because I had never seen him.

9   Q    And what was the name that you learned in court?

10  A    His last name is McNeil.

11  Q    Now, you are currently charged in Chicago; are you not?

12  A    Yes.

13  Q    And you're charged with conspiracy to possess with intent

14  to distribute marijuana, correct?

15  A    Yes.

16  Q    And you're charged with a particular count on a particular

17  date that you possessed with intent to distribute marijuana,

18  correct?

19  A    Yes.

20  Q    And is that over 100 kilograms of marijuana?

21  A    Yes.

22       **MS. PROFIT:**  The Court's indulgence for a moment.

23       **(Pause)**

24  //

25  //

1   BY MS. PROFIT:

2   Q    How did you get -- how did you -- when you came -- when

3   you came to the United States, did you stay in the United

4   States or were there times when you left the United States?

5   A    I left on one occasion.

6   Q    And when was that approximately?

7   A    In December of '99.

8   Q    And how did you get back into the United States?

9   A    Some friends of Mario Tellez helped me to cross.

10  Q    And where did you cross?

11  A    In Reynosa.

12  Q    And were you picked up on this side of the river?

13  A    Yes.

14  Q    And who picked you up?

15  A    Mario Valdez's son.

16  Q    And was there anyone else that was with him?

17  A    His dad and Mario Tellez.

18  Q    And where did they take you?

19  A    We were eating at a restaurant and then a hotel.   They

20  left me at a hotel.

21  Q    And did anyone else pick you up?

22  A    Yes.

23  Q    Who picked you up?

24  A    A friend of Nico's.

25  Q    Was Nico with him when he picked you up?

1   A     Yes.

2   Q     And where did they take you?

3   A     To a bus station in Alice, Texas.

4   Q     And then did you take the bus to Chicago?

5   A     Yes.

6          **MS. PROFIT:**  I have no further questions, your Honor.

7          **THE COURT:**  Mr. Mancias, sir?

8          **MR. MANCIAS:**  Just a few, Judge.

9                    **CROSS EXAMINATION**

10  **BY MR. MANCIAS:**

11  Q     Mr. Sebastian, you've been indicted out of Chicago; is

12  that correct, sir?

13  A     Yes.

14  Q     And you've been indicted for the offense of distributing

15  over 1,000 kilos of marijuana; is that correct, sir?

16  A     Yes.

17  Q     Have you pled guilty in that case, Mr. Sebastian?

18  A     No.

19  Q     Do you plan to enter a guilty plea?

20  A     Yes.

21  Q     When do you plan to do that, sir?

22  A     When I return to Chicago.

23  Q     After this testimony or this trial?

24  A     Yes.

25  Q     Mr. Sebastian, do you recall the date, the first time you

Guevara - Redirect                                          42

1   came to Dallas to deliver some money on El Conejo bus line?

2   A    No, I don't remember.

3   Q    Do you recall the date for the second trip you came to

4   Dallas to deliver some money?

5   A    I remember one date of both of those Dallas ones.  It was

6   2/27 of 2000.

7   Q    What's the date for the San Antonio trip?

8   A    I don't remember the date.

9   Q    Wasn't that 2/27 of the year 2000?

10  A    Yes, it was true.

11  Q    But you can't recall the Dallas dates; is that correct,

12  sir?

13  A    Yes.

14  Q    Mr. Sebastian, how would you transport the money down from

15  Illinois to Dallas, Texas or San Antonio?

16  A    On the bus, the El Conejo line.

17  Q    But how would you carry the money itself?

18  A    I had it on the body.

19  Q    Taped onto your body?

20  A    Yes.

21         **MR. MANCIAS:**  I'll pass the witness, Judge.

22         **THE COURT:**  Ms. Profit?

23                      **REDIRECT EXAMINATION**

24  BY MS. PROFIT:

25  Q    When you indicated that your first trip to Dallas, that

**EXCEPTIONAL REPORTING SERVICES**

Guevara - Redirect                              43

1   was -- when you went to Dallas, that was the time that you

2   delivered the money to Nicholas Gonzalez, correct?

3   A    Yes.

4   Q    Did you ever hear anything afterwards about what had

5   happened to that money?

6   A    Yes.

7   Q    What had you heard?

8   A    Mario told me -- Mario Tellez told me that they had taken

9   the money away from him.

10  Q    And when you say that Mario Tellez told you that they had

11  taken the money away from them, do you mean the police had

12  taken the money away from him?

13  A    Yes.

14  Q    So, the date of that seizure, right around that time would

15  have been when you made the trip to Dallas; is that correct?

16  A    Could you repeat the question?

17  Q    I was just asking if you knew the date -- if that -- that

18  money was eventually taken by the police, correct?  That money

19  was seized -- you were told by Mario Tellez that that money had

20  been taken by the police?

21  A    Yes.

22  Q    Now, the time that you took the money to Guadalupe Garcia,

23  that was right around that telephone call, correct?

24  A    Yes.

25            **MS. PROFIT:**  I have no further questions, your Honor.

45

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_Mary Henry_                          _5/31/01_
**Transcriber**                                        **Date**


TRANSCRIPT AUTHENTICATED BY:


*TONI HUDSON*


FEDERALLY-CERTIFIED TRANSCRIBER


_Toni Hudson_                          _May 31, 2001_



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
McALLEN DIVISION


UNITED STATES OF AMERICA,  )     CASE NO:   CR M-00-440
                          )
              Plaintiff,   )        CRIMINAL
     vs.                   )
                          )      McAllen, Texas
MARIO MARTINEZ,            )
                          )     Tuesday, May 22, 2001
_____Defendant.___)    (11:28 To 11:44 a.m.)


JURY TRIAL - DAY 3
(PARTIAL TRANSCRIPT OF PROCEEDING)
(TESTIMONY OF GUADALUPE GARCIA)


BEFORE THE HONORABLE RICARDO H. HINOJOSA,
UNITED STATES DISTRICT JUDGE


EXCEPTIONAL REPORTING SERVICES
3409 BROYLES STREET
HOUSTON, TEXAS 77026
713 670-7774



GOVERNMENT
EXHIBIT
E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
McALLEN DIVISION


UNITED STATES OF AMERICA, )  CASE NO:  CR M-00-440
         )
     Plaintiff, )   CRIMINAL
  vs.       )
         )  McAllen, Texas
MARIO MARTINEZ,   )
         ) Tuesday, May 22, 2001
     Defendant. ) (11:28 to 11:44 a.m.)


JURY TRIAL - DAY 3
(PARTIAL TRANSCRIPT OF PROCEEDING)
(TESTIMONY OF GUADALUPE GARCIA)

BEFORE THE HONORABLE RICARDO H. HINOJOSA,
UNITED STATES DISTRICT JUDGE


Appearances:


For the Government:  (See next page)

For the Defendant:  (See next page)


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

<u>APPEARANCES</u>:


For the Government:        PATRICIA PROFIT, ESQ.
                          Assistant United States Attorney
                          1701 W. Business Highway 83
                          Suite 600
                          McAllen, Texas 78501

For the Defendant:        FERNANDO MANCIAS, ESQ.
                          2408 N. Conway
                          Mission, Texas 78572

Official Interpreter:     Jonathan Gonzalez

Court Recorder:           Antonio E. Tijerina

Transcriber:              Toni Hudson
                          Exceptional Reporting Services
                          P.O. Box 61850
                          Houston, Texas 77208
                          713 670-7774

3

INDEX

| WITNESS FOR THE GOVERNMENT: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Guadalupe Garcia | 4 | 14 | 15 | -- |

EXHIBITS:            NONE

Garcia - Direct                                    4

1          **McAllen, Texas; Tuesday, May 22, 2001; 11:28 a.m.**

2              **(Official Interpreter present in courtroom)**

3         **(Entire proceeding recorded; partially transcribed)**

4                          **(Jury Present)**

5              **THE COURT:**  Go ahead and call your next witness.

6              **MS. PROFIT:**  Your Honor, the Government would call

7    Guadalupe Garcia.

8              **THE COURT:**  Mr. Garcia, if you don't mind coming up

9    here, sir.  You can be sworn in please, sir.

10             **THE CLERK:**  Please raise your right hand, sir.

11         **(Witness sworn)**

12             **THE COURT:**  Go ahead and have a seat right up here

13   please, sir.

14             Go ahead Ms. Profit.

15                        **DIRECT EXAMINATION**

16   **BY MS. PROFIT:**

17   Q    Mr. Garcia, could you state your name for the record

18   please?

19   A    Guadalupe Garcia.

20   Q    And Mr. Garcia, what do you do for a living?

21   A    Truck driver.

22   Q    And whereabouts do you live?

23   A    San Juan.

24   Q    Is that San Juan down here in Texas?

25   A    It's in Texas.

Garcia - Direct                                    5

1   Q    And how long have you lived in the San Juan area?

2   A    About -- I would say 15 years in San Juan and then the

3   rest of them in Edcouch.

4   Q    Now, Mr. Garcia, do you know an individual by the name of

5   Mario Valdez?

6   A    Yes, ma'am.

7   Q    And did you work for him for a period of time?

8   A    Yes.

9   Q    And when you worked for him, did you work for him as a

10  truck driver?

11  A    Yes.

12  Q    Now, do you recall that in -- sometime in March of 2000,

13  that Mr. Valdez asked you to take a trip for him?

14  A    Well, he asked me and it was for a friend of his.

15  Q    Pardon me.  I didn't hear that.

16  A    He asked me, yes.  Mario Valdez asked me for a trip for a

17  friend of his.

18  Q    And do you recall where you went?

19  A    Dallas.

20  Q    And when you said that he asked you to take the trip for a

21  friend of his, what do you mean?

22  A    He had another man with him.

23  Q    And who is the other man that was with him?

24  A    I think Mario -- I think his last name is Tellez or they

25  call him "Moco."

1   Q    And what did they -- what did Mario Valdez or Mario Tellez

2   ask you to do in Dallas?

3   A    They -- the other man sold a truck and trailer and they

4   had some money that they wanted to bring back.

5   Q    And did they describe to you where you had to go?

6   A    Where?

7   Q    Uh-huh.

8   A    Yes, ma'am.  It was behind the bus station of El Conejo.

9   There was a restaurant.  Somebody was going to meet me there.

10  Q    And did they describe the person who was going to meet you

11  there?

12  A    No.

13  Q    What did they tell you about the person that was going to

14  meet you there?  How were you going to know it was the right

15  person?

16  A    They were going to tell him who I was.

17  Q    And did you go to Dallas?

18  A    Yes.

19  Q    Did they give you any money for expenses or anything like

20  that?

21  A    No.  They paid me when I was back.

22  Q    How much did they pay you when you got back?

23  A    $350.

24  Q    Now, when you went to Dallas, did you meet an individual?

25  A    Yes, ma'am.

Garcia - Direct                               7

1    Q    And what did that individual look like?

2    A    A young boy.

3    Q    When you say "a young boy," what do you mean?

4    A    What do I mean?

5    Q    Uh-huh.

6    A    Well, 20 -- 20-something years old.   Twenty-five -- I

7    don't -- twenty-two.

8    Q    Did he introduce himself to you?

9    A    No.

10   Q    What did he -- when you got to Dallas, where did you go?

11   Did you go to the bus station?

12   A    To the -- no.   To the restaurant in front.

13   Q    And what did you do there?

14   A    I was eating breakfast when he got there.

15   Q    And did he walk up to you or what?

16   A    Yes.

17   Q    And what did he say to you?

18   A    "Are you Lupe?"   "Yes."   I think he -- that's what he

19   asked me.   I really don't remember what he asked me but he

20   said, "Are you this person?"   "Yes, I am."

21   Q    And what did he tell you to do?

22   A    Well, we said -- I told him to sit down.   And I had

23   somebody with me.   I told him, "Just go and pay and go to

24   pickup.   Wait for me."   And --

25   Q    You told the person that you had with you --

EXCEPTIONAL REPORTING SERVICES

1   A     Yes.

2   Q     -- to go and wait for you in the pickup?

3   A     Yes.

4   Q     And who was that individual?

5   A     My girlfriend.

6   Q     So then after you sent your girlfriend off to sit in the

7   pickup, what did you say to --

8   A     To hand me -- and just go ahead and give me the money.

9   Q     And what did he say to you?

10  A     He said, "Not here."  I said, well, "What's -- what -- how

11  come?"  He said, "I got a belt."

12  Q     So what did you do?

13  A     And he said, "Let's go into the bathroom.  I'll go into

14  the bathroom, wait a few minutes and then you come in, too."

15  Q     And did you do that?

16  A     Yes, ma'am.

17  Q     And what happened?  What did you see when you went into

18  the bathroom?

19  A     Well, it was like a belt wrapped in -- I don't know --

20  that gray tape, that thick gray tape all over packages like a

21  belt.

22  Q     And when you say "it was wrapped in gray tape," how many?

23  Were there compartments or what?

24  A     It was maybe four or five, five compartments.

25  Q     Now, had Mario Valdez told you how much money you were

Garcia - Direct                                        9

1   picking up?

2   A    Yes.

3   Q    And how much money had he told you you were picking up?

4   A    $50,000.

5   Q    And what did you do with the money belt?

6   A    I put it on myself, wrapped it and left.

7   Q    And where did you go?

8   A    To my house.  And then the next day, I went to Mario

9   Tellez's house.

10  Q    And where is Mario Tellez's house located?

11  A    It's in Weslaco.

12  Q    And what did you do at Mario Tellez's house -- what car

13  did you drive to Dallas?

14  A    My girlfriend's pickup.

15  Q    And what kind of a pickup truck is that?

16  A    GMC pickup.

17  Q    Is it a particular color?

18  A    Gray.

19  Q    And when you -- when you went to Mario Tellez's house the

20  next day, who was there?

21  A    Both of them.  Mario Tellez and Mario Valdez.

22  Q    And approximately what time was that?  Do you recall?

23  A    It was either 9:00 -- 9:00 or 9:30.  I don't recall the

24  time but it was in the morning from 8:00 or 9:00.  I don't

25  recall the time.

Garcia - Direct                                        10

1   Q    And when you went to Mario Tellez's house, what did you do

2   with the money belt?

3   A    It was -- I had it there in a safe.  And they took the

4   pickup into the garage and got it from there.

5   Q    Did they say anything to you about having left the money

6   belt on the seat?

7   A    Yes.  How come I had it right in front of my seat.  He

8   said, how come I didn't hide it or something.

9   Q    Did they suggest to you why you might want to hide it?

10  A    Yes.  They said, maybe they could have -- I could have

11  gotten stopped and being checked or something.

12  Q    Now, what happened after they took the car into the

13  garage?  They took your pickup truck into the garage.  What

14  happened then?

15  A    They took the money out and put my pickup outside.

16  Q    When they took the pickup outside, what did you do?

17  A    I was going to leave and then Mario Valdez asked me for a

18  ride.

19  Q    And where did he ask you for a ride?

20  A    Well, he just said, "Give me a ride."  And I thought it

21  was to his house just about two -- one or two blocks from

22  there.  And when I passed to his house he said, "No, give me a

23  ride to the bridge, Progresso."

24  Q    Did you happen to notice if anyone was following you

25  when --

1   A     Not at the time.

2   Q     Did you realize later that someone was following you?

3   A     Yes, ma'am.

4   Q     And who was following you?

5   A     Mario Tellez.

6   Q     And what kind of vehicle was he following you in?

7   A     In a green pickup.

8   Q     How did you come to realize that?

9   A     Because Mario Valdez got out after -- he said, "Go across

10  the bridge," and I dropped him off across the bridge.  And then

11  right at the first street, I turned around.  He said, "Wait a

12  minute here," and then he got out.  And then by that time, the

13  other pickup was coming and he just said "thank you" and left.

14  Q     Now, when you said that this took place, you said "across

15  the bridge."  What bridge do you mean?

16  A     Progresso.

17  Q     So you crossed at Progresso and you went through customs

18  -- I mean, you were exiting, correct?

19  A     Yes.

20  Q     And you were driving your pickup?

21  A     Yes.

22  Q     And how far -- did you go into Mexico at all or --

23  A     Just behind that customs building.  First street right

24  there.

25  Q     And what did Mario Valdez say to you?

1    A    "Thank you."  He got out and -- got off on that other --

2    got on the other pickup.

3    Q    Were you surprised when he asked you to pull over?

4    A    Well, I didn't know what he was going to do.  I just

5    had --

6    Q    And what did you do?

7    A    Came back home.

8    Q    Now, Mr. Valdez, you were charged in an indictment --

9    A    I'm Mr. Garcia.

10   Q    Excuse me -- Mr. Garcia.

11        Mr. Garcia, you were charged in an indictment in

12   M-00-439, correct?

13   A    Yes, ma'am.

14   Q    And you've entered into a plea agreement with the

15   Government, correct?

16   A    Yes, ma'am.

17   Q    But that plea agreement, you haven't -- you haven't had --

18   you haven't entered a guilty plea yet.

19   A    No.

20   Q    I mean, you haven't appeared before the Court and pled

21   guilty in?

22   A    No, ma'am.

23   Q    But the plea agreement provides that you plead guilty to

24   Count 14, correct?

25   A    Yes.

1   Q     And that's the money laundering count?

2   A     Yes.

3   Q     And then in return, the Government will dismiss the other

4   counts?

5   A     Yes.

6   Q     And that would be the conspiracy count with respect to the

7   cocaine and the conspiracy count with respect to the marijuana,

8   correct?

9   A     Yes, ma'am.

10  Q     And there is also a substantive cocaine count, correct?

11  A     Yes, ma'am.

12  Q     And in addition to that, you've had -- you've testified in

13  Philadelphia, have you not?

14  A     Yes, ma'am.

15  Q     And that was pursuant to a proffer letter that you

16  executed with the U.S. Attorney's Office in Philadelphia,

17  correct?

18  A     Yes, ma'am.

19  Q     And you also had executed proffer letters with respect to

20  -- had proffer letters from this district as well?

21  A     Yes, ma'am.

22        MS. PROFIT:  I have no further questions of this

23  witness.

24        THE COURT:  Mr. Mancias, sir?

25        MR. MANCIAS:  Yes, thank you, Judge.

1                          CROSS EXAMINATION

2    BY MR. MANCIAS:

3    Q     Mr. Garcia, good morning, sir.

4    A     Good morning.

5    Q     Do you recall the date of the trip to Dallas?

6    A     No, sir.

7    Q     Was it early 2000?  Mid 2000?

8    A     It was probably -- I've seen the papers and I can't even

9    remember the date.  But I think it was '99, the -- like on the

10   last of '99 or -- no, I don't remember.

11   Q     Okay.  Do you think it may have been late '99?

12   A     It could be.

13   Q     And do you recall the date that you brought Mr. Tellez to

14   the Progresso bridge?

15   A     Do I recall?

16   Q     Yes, sir.

17   A     Yes.

18   Q     What date was that?

19   A     Oh, I mean, the date?

20   Q     Yes.

21   A     No.  No, sir.

22   Q     Was it 1999 or 2000?

23   A     I looked at the papers; they took them away from me.  They

24   -- I've been all over the United States.  And everywhere I go,

25   they clean my -- they don't leave a paper on me.  I had my

Garcia - Redirect                                          15

1    indictment with me and they took it away.

2    Q    Mr. Garcia, on this indictment that you will plead guilty

3    to, who -- when were you arrested on this charge?

4    A    January the 22nd.  That one I can remember.

5    Q    All right.  And is that about the first time that you met

6    Mario Martinez, my client?

7    A    Yes, sir.

8    Q    The first time you met him was in jail?

9    A    In jail.

10   Q    And you signed the plea agreement just a while ago, this

11   morning; is that correct, sir?

12   A    Yes, sir.

13   Q    All right.

14        MR. MANCIAS:  I'll pass the witness, Judge.

15        THE COURT:  Ms. Profit?

16                    REDIRECT EXAMINATION

17   BY MS. PROFIT:

18   Q    When you keep referring to "the paper," are you referring

19   to the indictment?

20   A    (No audible response).

21   Q    Excuse me.  You were saying that it was on "the paper."

22   A    What paper?

23        Oh, I mean, those -- they gave me some -- like I

24   think it was an indictment.

25        Mr. Connors, what was it?  The --

Garcia - Redirect                                    16

1          THE COURT:  Do you need to consult with your

2   attorney?

3          THE WITNESS:  Yes.

4          THE COURT:  Okay.  You can go ahead and visit with

5   him, Mr. Connors.

6      (Pause)

7          THE WITNESS:  March the 22 in 2000; that's when I

8   brought the money back.

9   BY MS. PROFIT:

10  Q    And you're referring to the indictment, correct?

11  A    Yes, ma'am, the indictment.

12  Q    And you have no reason to challenge that date in the

13  indictment.  That's the date that it happened?

14  A    That -- yes.

15         MS. PROFIT:  No further questions, your Honor.

16         MR. MANCIAS:  I have no further questions.

17         THE COURT:  You may go ahead and step down,

18  Mr. Garcia.

19         Unless I hear otherwise, he's excused.

20     (Witness excused)

21     (This portion concluded at 11:44 a.m.)

22

23

24

25

17

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    8 / 15 / 01
          Transcriber                                      Date


                              TONI HUDSON




              FEDERALLY-CERTIFIED TRANSCRIBER

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| **UNITED STATES OF AMERICA** } | **CASE NO.  M-00-439** |
| } | |
| **v.** } | **AFFIDAVIT IN SUPPORT OF** |
| } | **REQUEST FOR EXTRADITION** |
| **JUAN LOZANO** } | |
| **JOSE MARIO TELLEZ** } | |
| **MARIO VALDEZ** } | |
| **ET AL** } | |
| _____ } | |

I, Wayne Bruce Furnia, being duly sworn, deposes and states:

1.  I am a citizen of the United States of America, residing in Texas.

2.  I am a Special Agent employed by the United States Federal Bureau of Investigation (FBI).  I have been so employed for approximately six (6) years.  Prior to my employment as a Special Agent of the FBI, I was employed as a Deputy Sheriff for six (6) years by the Dona Ana County Sheriff's Department in the state of New Mexico.

3.  The FBI is responsible for the enforcement of several federal laws to include narcotic violations.  As a Special Agent of the FBI, I have personally conducted, participated and supervised in investigations which have resulted in the arrest and conviction of numerous individuals responsible for trafficking in narcotics.

4.  Based on my training and experience as a Special Agent

1

with the FBI, I am familiar with the means and methods that narcotic traffickers use to import and distribute illicit drugs, and I am familiar with the support and assistance that narcotics organizations require to conduct their illegal activities.  I also have become knowledgeable about the criminal statutes of the United States, particularly in the area of the criminal law relating to violations of the federal narcotics and conspiracy statutes.

5.  My duties as a Special Agent with the FBI have included conducting an investigation of Juan Lozano and other members of his organization in the case of <u>United States of America v. Juan Lozano, Jose Mario Tellez, Mario Valdez et al.,</u> Case No. M-00-0439.  As one of the lead investigators, I am familiar with the evidence in this case.  I have determined  that on December 3, 1997 Jose Mario Tellez became a Naturalized Citizen of the United States of America having been naturalized at the United States District Court for the Southern District of Texas at Brownsville, Texas.

6.  Beginning on or about January 1995 and continuing to the present Federal Law Enforcement Agencies consisting of the Federal Bureau of Investigation, Drug Enforcement Administration, United States Customs Service, Immigration and Naturalization Service, Internal Revenue Service and law enforcement officers from the Texas Department of Public Safety have been conducting a long term investigation regarding a significant drug trafficking

2

organization.  The organization has been identified as the JUAN
LOZANO drug trafficking organization (LDTO) and is led by Juan
Manuel Lozano-Tijerina from China, Nuevo Leon, Mexico.

7.   The LDTO is a secondary drug trafficking organization
involved in the trafficking of multi-ton quantities of cocaine
and marijuana. The LDTO distributes cocaine and marijuana to
major metropolitan areas to include Chicago, Illinois, Charlotte,
North Carolina, Houston, Texas, New York, New York and New
Jersey.

8.   To date the investigation has resulted in the seizure of
approximately 7000 kilograms of cocaine and more than 11,000
pounds of marijuana which was associated with the LDTO.

9. On August 29, 2000, a United States Federal Grand Jury
for the Southern District of Texas convened in Brownsville, Texas
and returned a true bill for the indictment of 21 individuals,
which included Juan Lozano, Jose Mario Tellez and Mario Valdez.
United States Magistrate Judge Felix Recio authorized the arrest
of 21 individuals for violations of Title 18 U.S.C. 1956, Money
Laundering and Title 21 U.S.C. 841 and 846, Possession and
Conspiracy to distribute marijuana and cocaine.

10.   Subsequent investigation has determined that Jose Mario
Tellez and Mario Valdez are Lieutenants for the LDTO and together
they arranged for the transportation and delivery of large
quantities of cocaine and marijuana to large metropolitan United
States cities.  Jose Mario Tellez and Mario Valdez also
coordinated the transportation of drug proceeds from major

3

metropolitan United States cities back to the Texas, Rio Grande Valley.

11.  On or about September 9, 1998, 471 kilograms of cocaine was seized by the Texas Department of Public Safety (**see Attachments 2a through 2h and laboratory report 2i**).  Information obtained from telephone toll records and a co-conspirator corroborated that Jose Mario Tellez was involved in coordinating the transportation.

12.  In February of 2000, the investigation revealed that Jose Mario Tellez was involved in negotiating the sale of 92 pounds of marijuana to buyers in Houston, Texas.  The marijuana was eventually seized by the Houston Police Department on February 3, 2000.  **(See laboratory report Attachment 3)**

13.  In February of 2000, the investigation revealed and information from co-conspirators corroborated that Jose Mario Tellez was involved in the transportation of 1500 pounds of marijuana to Chicago, Illinois and Lansing, Michigan.  On 2/21/2000, 350 pounds of the 1500 pounds of marijuana **(see attachments 4a and 4b and laboratory report 4c)** and seventy-five thousand three hundred and forty-six dollars ($75,346) was seized by the Michigan State Police.

14.  On or about February 28, 2000, FBI surveillance, conducted by the affiant and other agents, followed Jose Mario Tellez and Mario Valdez from the Texas, Rio Grande Valley to a

4

Holiday Inn hotel (**see attachment 5)** in San Antonio, Texas.
Further investigation and physical surveillance corroborated that
Jose Mario Tellez and Mario Valdez met with a co-conspirator and
received forty thousand dollars ($40,000) in proceeds from the
sale of drugs in Chicago, Illinois.

15.   On or about March 8, 2000, twenty thousand dollars
($20,000) were seized by the FBI in Dallas, Texas.  FBI
surveillance conducted on a co-conspirator in Dallas and
information from other co-conspirators corroborated that Jose
Mario Tellez was involved in coordinating the pick up and
delivery of twenty thousand dollars ($20,000) in illegal drug
proceeds.

16.   On or about March 14, 2000, source information and FBI
physical surveillance conducted in the Texas, Rio Grande Valley
and Chicago, Illinois revealed that Jose Mario Tellez and Mario
Valdez were involved in the negotiation and transportation of
fifty thousand dollars ($50,000) in illegal drug proceeds from
Chicago, Illinois to the Texas, Rio Grande Valley. **See attachment
6a through 6f)**

17.   On or about March 22, 2000, the investigation and
information subsequently obtained from a co-conspirator revealed
that Jose Mario Tellez and Mario Valdez were involved in the
negotiation and transportation of forty four-thousand five-
hundred dollars ($44,500) in illegal drug proceeds from Chicago,

5

Illinois to Texas and elsewhere.

18.   On or about April 3, 2000, one thousand three hundred and sixty three (1,363) pounds of marijuana was seized by the Illinois State Police **( see attachment 7 and laboratory report 7a)**.  Information obtained from the investigation,co-conspirators and source information corroborated that Jose Mario Tellez and Mario Valdez were involved in coordinating the delivery of the marijuana to Chicago, Illinois.

19.   On or about April 13, 2000, one thousand two hundred and sixty (1,260) pounds of marijuana was seized by federal law enforcement agencies in Chicago, Illinois **(see attachments 8a,8b and 8c and laboratory report 8d)**.  Information obtained from the investigation, co-conspirators, source information and physical surveillance conducted by agents in Chicago, which subsequently led to the seizure of the marijuana, corroborated that Jose Mario Tellez and Mario Valdez were involved in coordinating the transportation and delivery of the marijuana.

20.   On or about July 13, 2000, one thousand three hundred and seventy six (1,376) pounds of marijuana was seized by federal law enforcement agencies **(see attachments 9a and 9b and laboratory report 9c)**.  Physical surveillance and source information corroborated that Jose Mario Tellez and Mario Valdez were involved in coordinating the transportation and the delivery

6

of the marijuana.

21.   I have attached as **attachment 1** to this affidavit a photograph of Jose Mario Tellez.  The attached photograph has been identified by several co-conspirators and cooperating witnesses as the person involved in drug trafficking activities associated with the Juan Lozano drug trafficking organization. The attached photograph of Jose Mario Tellez has also been identified by the affiant and other federal law enforcement agents while conducting physical surveillance operations.

22.   I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.


WAYNE BRUCE FURNIA, SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION



SWORN AND SUBSCRIBED BEFORE ME
THIS__*15th*__ DAY OF __*May*__ , 2002



UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF TEXAS

7

8





GOVERNMENT
EXHIBIT





















PRIORITY   S+B

NC 5769   12494:

U.S. Department of Justice
Drug Enforcement Administration

Read Instructions on Reverse
before completing.

**REPORT OF DRUG PROPERTY COLLECTED, PURCHASED OR SEIZED**

| 1. HOW OBTAINED (Check) | | | | |
|---|---|---|---|---|
| ☐ Purchase | ☒ Seizure | ☐ Free Sample | **2a. FILE NO.** | **2b. PROGRAM CODE** |
| ☐ Lab. Seizure | ☐ Money Flashed | ☐ Compliance Sample (Non-Criminal) | M5-98-0224 | HID100 |
| ☐ Internal Body Carry | ☐ Other (Specify) | | | **3. G-DEP ID** UCC1D |

| 4a. WHERE OBTAINED (City, State/Country) San Manuel | 4b. DATE OBTAINED 9/9/98 | 5. FILE TITLE PEREZ, Ray |
|---|---|---|

| 6a. REFERRING AGENCY (Name) | 6b. REFERRAL ☐ Case No. OR ☐ Seizure No. No. | 7. DATE PREPARED 9/25/98 | 8. GROUP NO. 3 |
|---|---|---|---|

| 9. Exhibit No. | 10. FDIN (8 characters) | 11. ALLEGED DRUGS | 12. MARKS OR LABELS (Describe fully) | APPROX. GROSS QUANTITY | | Purchase Cost |
|---|---|---|---|---|---|---|
| | | | | 13. Seized | 14. Submitted | |
| 1 | 98121920 | Cocaine | fourty-four (44) boxes of | | 1,115.0 | 0.0 |
| | | | a white powdery substance | | | |
| | | | wrapped in clear plastic | | | |

16. WAS ORIGINAL CONTAINER SUBMITTED SEPARATE FROM DRUG ?  ☒ NO (included above)   ☐ YES (if Yes, enter exhibit no. and describe original container fully)

REMARKS:

On 9/9/98, Exhibit 1 was seized by Sergeant Mario Lopez in San Manuel, Texas from a truck driven by Ray Perez.  Exhibit 1 was tured over to S/A Large, on that same date. Exhibit 1 was processed as evidence by S/A Large, as witnessed by S/A Workman.  Following processing, TFA Padilla transported Exhibit 1 to the South Central Lab via DEA air wing.

| 17. SUBMITTED BY SPECIAL AGENT (Signature) S/A Ferdinand Large | 18. APPROVED BY (Signature & Title) G/S Cliff Brothers |
|---|---|

**LABORATORY EVIDENCE RECEIPT REPORT**

| 19. NO. PACKAGES 44 Boxes | 20. RECEIVED FROM (Signature & Date) R. Padilla 9-25-98 | 21. Print or Type NAME and TITLE Roy Padilla TFA |
|---|---|---|
| 22. SEAL ☐ Broken ☒ Unbroken | 23. RECEIVED BY (Signature & Date) Runnels 9/25/98 | 24. Print or Type NAME and TITLE Sergeant Runnels Evidence, |

**LABORATORY REPORT**

25. ANALYSIS SUMMARY AND REMARKS

Exhibit 1 contains Cocaine HCl
   Gross Wt: 504.6 kg      Net Wt: 436.9 kg
1 g removed from each of 12 bricks for special program.
4 wrappers removed for special program.
426.0 kg available for destruction on 11/24/98 pending written notification.

GOVERNMENT EXHIBIT
2i
attach
PFK/GAD-Bayonne, N.J.

| 26. Exhibit No | 27. Lab. No. | 28. ACTIVE DRUG INGREDIENT (Established or Common Name) | CONCENTRATION | | | 32. AMT. OF PURE DRUG | 33. RESERVE |
|---|---|---|---|---|---|---|---|
| | | | 29. Strength | 30. Measure | 31. Unit | | |
| 1 | 124941 | Cocaine HCl | 86 | % | | 375.7kg | 436.9kg |

| 34. ANALYST (Signature) Stephen T. Brumbaugh | 35. TITLE Forensic Chemist | 36. DATE COMPLETED October 16, 1998 |
|---|---|---|
| 37. APPROVED BY (Signature & Date) Alan B. Clark   10/29/98 | 38. TITLE Laboratory Director | 39. LAB. LOCATION Dallas, Texas |

ident no. 014612600 G   CURRENT INFORMATION REPORT

PAGE 2.0(

SYSTEM ADVISORY: REPORT ENTERED USING PERSONAL COMPUTER   VER-2.10-4
********************************************************************
*   ENTRY DEVICE: GATEWAY 133 227115                              *
*   ENTRY FROM DATE-020700 TIME-1357  TO  DATE-020800 TIME-1147   *
*   TRANSFER DEVICE: COMPAQ PENTIUM 177106 N52          VER. 3.00C *
*   TRANSFER DATE-020800 TIME-1152   LOAD DATE-020800 TIME-1156   *
*   LOCATION OF OFFENSE: POLICE DISTRICT-CONFIDENTIAL     DIST-CO  *
********************************************************************

--------------------------------------------------------------------

SUPPLEMENT(S)

--------------------------------------------------------------------

No-0001

Offense- INVESTIGATION (NARCOTICS)
                        Street location information
Number-    12000 Name-VETERANS MEMORIAL        Type-DR      Suffix-
Date of offense-02/03/00                Date of supplement-02/08/00
Compl(s) Last-STATE OF TEXAS  First-          Middle-
         Last-
                    Recovered stolen vehicles information
  Stored-                      by-                  Ph#- (000) 000-0000
  Officer1-GREEN, Dennis       Emp#-105309 Shift-  Div/Station-CRIME LAB

                    SUPPLEMENT NARRATIVE

SUSPECT(S): UNKNOWN                          REF:  L00-1579
                              CRIMINALIST:  GREEN

                        EVIDENCE SUBMITTED
____CONTAINER(S) CHUNK SUBSTANCE    ____CIGARETTE(S)      ____TABLET(S)
____CONTAINER(S) POWDER             ____CIGARETTE STUB(S) ____CAPSULE(S)
_19_CONTAINER(S) PLANT SUBSTANCE    ____CIGAR(S)          ____PIPE(S)
____CONTAINER(S) LIQUID             ____CIGAR STUB(S)     ____SYRINGE(S)
____OTHER:

                        RESULTS OF ANALYSIS

MARIHUANA - APPROXIMATELY 90.4 POUNDS (41.1 KILOGRAMS)
&&&&

GOVERNMENT
EXHIBIT
3
attach









**February 21, 2000, 350 lbs. Of Marijuana seized by the Michigan State Police in Lansing, MI. Residence of Guadalupe Alvarez. Sr.**

MAY 17-2001  16:30        FBI LANSING                          517 336 8343      P.01

# DEPARTMENT OF STATE POLICE
## FORENSIC SCIENCE DIVISION
### EAST LANSING LABORATORY
714 S. HARRISON ROAD
EAST LANSING, MICHIGAN 48823-5143
(517)336-6183
FAX (517)336-6511

## LABORATORY REPORT

| | | |
|---|---|---|
| Laboratory No.: | 5691-00 | |
| Received By : | Bradley Choate | |
| Delivered By : | D/Sgt. Robyn Lynde | |
| Agency : | Tri-County Metro | |
| Agency No.: | TCM-29-00 | |

| | | |
|---|---|---|
| Record No. | : | 0000800 |
| Date Received : | | 03-03-00 |
| Time Received : | | 12:58 PM |
| File Class : | | 3500-1 |
| Date Completed: | | 03-15-00 |
| Bin No. | : | 10 |

**Nature of Offense:**

Violation of Public Health Code

ITEM(S) RECEIVED BY

SIGNED _____

AGENCY _____

DATE 3-2-4-00 time 9:13A

RELEASED BY _____

**Suspect(s):**

ALVAREZ

GOVERNMENT
EXHIBIT
4C
attach

**Evidence Received:**

ITEM #30:   1 – sealed clear plastic evidence envelope containing:
2 - clear plastic ziplock bags each containing plant material

ITEM #32:   1 – sealed clear plastic evidence envelope containing:
5 – clear plastic ziplock bags each containing plant material

ITEM #33:   1 – sealed cardboard box containing:
8 8 –clear plastic ziplock bags each containing plant material

6 – sealed brown paper evidence bags (ITEMS #39, #40, #41, #42, #43 and #44) each containing
compressed bundles of plant material.  The bundles were wrapped in clear plastic, and tan tape.

**Results of Examinations:**

ITEM #30:   The two ziplock bags and contents weighed a total of 925 grams.  The plant material
from one randomly selected bag weighed 586 grams and consisted of Marihuana,
Schedule I, hallucinogen.

ITEM #32:   The five ziplock bags and contents weighed a total of 2,298 grams (2.298 kilograms).
The plant material from one randomly selected bag weighed 451 grams and consisted
of Marihuana.

ITEM #33:   The eighty-eight (88) ziplock bags and contents weighed a total of 40,085 grams
(40.085 kilograms).  The plant material from one randomly selected bag weighed
447 grams and consisted of Marihuana.

*Public Act 35 of 1994 requires: "The investigating officer of each criminal case being
adjudicated shall advise the prosecuting attorney if a forensic test has been conducted in the case."*

ge 2    Lab #5691-00                    Complaint #TCM-29-00
                                        File Class 3500-1/TCM

**Results of Examinations:    (con't.)**

The compressed bundles from ITEMS #39, #40, #41, #42, #43 and #44 were examined and each consisted of Marihuana.

| ITEM # | WEIGHT |
|--------|--------|
| 39 | 21,675 grams (21.675 kilograms) |
| 40 | 16,897 grams (16.897 kilograms) |
| 41 | 17,366 grams (17.366 kilograms) |
| 42 | 16,142 grams (16.142 kilograms) |
| 43 | 14,784 grams (14.784 kilograms) |
| 44 | 21,719 grams (21.719 kilograms) |

Total Weight = 108,583 grams (108.583 kilograms)

Bradley D. Choate
Forensic Scientist
Narcotics and Dangerous Drugs Subunit

:nkg
.  .5/00



GOVERNMENT
EXHIBIT
4c
attach

*Public Act 35 of 1994 requires: "The investigating officer of each criminal case being adjudicated shall advise the prosecuting attorney if a forensic test has been conducted in the case."*

## Holiday Inn EXPRESS

### SOUTH
606 Division Avenue
San Antonio, Texas 78:
210/927-4800
Fax 210/927-5060

JOSE    TELLEZ
1320 S BRIDGE LO.  12
15848749

WESLACO       TX 78596

| | |
|---|---|
| Room | 113/11 |
| Arrive Date | 22/25/00 |
| Dept. Date | 22/29/00 |
| Folio # | 75-00 |
| Room Rate | 1 0000 |
| Account | 5 TUAH |
| Mkt/Seg | 456    Page  1 |

Independently Owned and Operated by Y A  Pak Ir :

I authorize you to the full balance of my account to my credit card which was pr sentied upon registration

SIGNATURE

The managem nt is not responsible for any valuacles not secured i i safety deposit boxes provided at the front d e. I agree that my acility for the charges is not waiv d and agree to be held personally ent that the indicated person some rm or associat on fails to pay for any part of the such charges

X
SIGNAT RE

| DATE | REFERENCE | ID | DESCRIPTION | CHARGE | PAYMENT | BALANCE |
|---|---|---|---|---|---|---|
| 28   11   11 | 8225660 | 456 | CASH PAYMENT | .00 | 92.25 | 92.23 |

***TOTAL***                                              $   -92.23

GOVERNMENT
EXHIBIT
attach
5



















GOVERNMENT
EXHIBIT
6e.
PENGAD-Bayonne, N. J.









# ILLINOIS STATE POLICE
Division of Forensic Services
Joliet Forensic Science Laboratory
515 East Woodruff Road
Joliet, Illinois 60432-1260
(815) 740-3543 (Voice) * 1-(800) 255-3323 (TDD)

George H. Ryan
*Governor*

May 12, 2000

Sam W. Nolen
*Director*

SCOTT LUSTIK
WILL COUNTY C-PAT
16648 SOUTH BROADWAY
LOCKPORT IL 60441

Laboratory Case #J00-003064
Agency Case #00F2698

OFFENSE:   Violation of Cannabis Control Act
SUSPECTS:  Curtis McNeill/Eunmio Garza

The following evidence was received from S. Lustik by the Joliet Forensic Science Laboratory on April 10, 2000:

| LAB/AGENCY | ITEM SUBMITTED | FINDINGS |
|---|---|---|
| 1A/4 | 28,935 grams of plant material | Cannabis |
| B/4 | Packaging from Exhibit 1A | See Remarks |
| 2A/7 | 27,225 grams of plant material | Cannabis |
| 2B/7 | Packaging from Exhibit 2A | See Remarks |

Remarks:  Exhibit 1B and Exhibit 2B sent to Latent Prints for analysis.

720 ILCS 5/5-9-1.4(b) states that a criminal laboratory analysis fee of $50 shall be imposed for persons adjudged guilty of an offense in violation of the Cannabis Control Act or the Illinois Controlled Substances Act.

Respectfully submitted,

Pamela M. Wilson
Forensic Scientist



GOVERNMENT
EXHIBIT
7a
attach









PENGAD-Bayonne, N. J.

GOVERNMENT
EXHIBIT





Read Instructions on Reverse
before completing.

**U.S. Department of Justice**
**Drug Enforcement Administration**

**REPORT OF DRUG PROPERTY COLLECTED, PURCHASED OR SEIZED**

| 1. HOW OBTAINED (Check) | | | | 2a. FILE NO. | 2b. PROGRAM CODE | 3. G-DEP IC |
|---|---|---|---|---|---|---|
| ☐ Purchase  ☒ Seizure  ☐ Free Sample | | | | 281C-CG-111858 | | |
| ☐ Lab. Seizure  ☐ Money Flashed  ☐ Compliance Sample (Non-Criminal) | | | | | | |
| ☐ Internal Body Carry  ☐ Other (Specify) | | | | | | |

| 4a. WHERE OBTAINED (City, State/Country) | 4b. DATE OBTAINED | 5. FILE TITLE |
|---|---|---|
| Bellwood, Illinois | 04/18/2000 | ████████ |

| 6a. REFERRING AGENCY (Name) | 6b. REFERRAL | | 7. DATE PREPARED | 8. GROUP NO. |
|---|---|---|---|---|
| FBI | ☐ Case No. OR  ☐ Seizure No  No. | | OC/DI - MDTO  04/19/2000 | Squad D-1 |

| 9. Exhibit No. | 10. FDIN (10 characters) | 11. ALLEGED DRUGS | 12. MARKS OR LABELS (Describe fully) | APPROX. GROSS QUANTITY | | 15. Purchase Cost |
|---|---|---|---|---|---|---|
| | | | | 13. Seized | 14. Submitted | |
| 1 | 2000078825 | Marijuana | Green, leafy substance contained in 29 bales, wrapped in clear cellophane | 571.27kg/gw | | |
| 1A | | Marijuana | Representative sample of of Exhibit #1 in h/s bag. | | 1130.0g/gw | |
| 1B-K | | Marijuana | Ten (10) samples of Exhibit #1 in 10 plastic bags in h/s bag. | | 203.0 g/gw | |

16. WAS ORIGINAL CONTAINER SUBMITTED SEPARATE FROM DRUG ?   ☒ NO (included above)   ☐ YES (if Yes, enter exhibit no. and describe original container fully)

REMARKS:

On 04/18/2000, Exhibit #1 was seized from a U-Haul van driven by ████████ following a consent search at 53 Marshall Avenue, Bellwood, Illinois.  Exhibit #1 was taken t the Chicago office of the FBI, 219 S. Dearborn Street, Chicago, Illinois by Special Agent (SA Jeffrey B. Walker, as witnessed by SA Dennis M. Wagner Jr..  Representative samples 1A-K were obtained by SA's Walker and Wagner.  On 04/19/2000, the representative samples were hand-carried to the DEA North Central Laboratory by SA Walker and SA Frank Depodesta.

| 17. SUBMITTED BY SPECIAL AGENT (Signature) | 18. APPROVED BY (Signature & Title) |
|---|---|
| Jeffrey B. Walker *Jeffrey B. Walker* | SSA Robert E. Casey Jr. *Robert E. Casey* |

**LABORATORY EVIDENCE RECEIPT REPORT**

| 19. NO. PACKAGES | 20. RECEIVED FROM (Signature & Date) | 21. Print or Type NAME and TITLE |
|---|---|---|
| 2 | *Jeffrey B. Walker* 4/19/00 | Jeffrey B. Walker S.A. |

| 22. SEAL | 23. RECEIVED BY (Signature & Date) | 24. Print or Type NAME and TITLE |
|---|---|---|
| ☐ Broken  ☒ Unbroken | *Detra Haywood* 4/19/00 | Detra Haywood F.T |

**LABORATORY REPORT**

25. ANALYSIS SUMMARY AND REMARKS

SEE ATTACHED

**GOVERNMENT EXHIBIT**
**8d**
**attach**

| 26. Exhibit No. | 27. Lab. No. | 28. ACTIVE DRUG INGREDIENT (Established or Common Name) | CONCENTRATION | | | 32. AMT OF PURE DRUG | 33. RESERVE |
|---|---|---|---|---|---|---|---|
| | | | 29 Strength | 30. Measure | 31. Unit | | |
| 1A-K | 129710 | | | | | | |

| 34. ANALYST (Signature) | 35. TITLE | 36. DATE COMPLETED |
|---|---|---|
| Roger G. Fuelster *Roger G. Fuelster* 5-30 | SENIOR FORENSIC CHEMIST | 05/24/00 |

| 37. APPROVED BY (Signature & Date) | 38. TITLE | 39. LAB LOCATION |
|---|---|---|
| *Ralph E. Esters* 6/24/00 | LABORATORY DIRECTOR | CHO. mmm 05/30/00 |

DEA Form      Previous edition dated 4/90 may be used until stock is exhausted      T Prosecution



**U.S. Department of Justice**
Drug Enforcement Administration
North Central Laboratory

# CHEMICAL ANALYSIS REPORT

To:   Herbert L. Collins                                          May 30, 2000
       Special Agent In Charge
       219 S. Dearborn, Room 905
       Chicago, Illinois 60604

  Attn:  SA Jeffery B. Walker

**Case Number:   281C-CG-111858**

<u>**Analysis Summary and Remarks:**</u>

**Laboratory No.:**     129710
**Exhibit** 1A-K contains:   Marijuana
**Gross Wt.:**  1333 grams (g)
**Net Wt.:** 1229 g
**Active Drug Ingredient:**   Marijuana
**Amount of Pure Drug:**  NA
**Reserve Wt.:** 1215 g

GOVERNMENT
EXHIBIT
8d
attach

Analyst Roger G. Fuelster        5-30-00
Senior Forensic Chemist
Date Completed: 05/24/00

Approved by Ralph C. Cottrell III        6/21/00
Laboratory Director
Laboratory Location:    Chicago, IL-mmm

Prosecution / Division / Orig. Office / Laboratory / Hdqtrs / Receipt Copy...........Page 1 of 1





**140003**

**U.S. Department of Justice**
**Drug Enforcement Administration**

Read Instructions on Reverse
before completing

P666'9

**REPORT OF DRUG PROPERTY COLLECTED, PURCHASED OR SEIZED**

| 1. HOW OBTAINED (Check) | | |
|---|---|---|
| ☐ Purchase ☒ Seizure ☐ Free Sample | | |
| ☐ Lab. Seizure ☐ Money Flashed ☐ Compliance Sample (Non-Criminal) | | |
| ☐ Internal Body Carry ☐ Other (Specify) | | |

| 2a. FILE NO | 2b. PROGRAM CODE | 3 G-DEP ID |
|---|---|---|
| M5-99-0134 | OCDETF | XNC1I |

| 4a WHERE OBTAINED (City, State/Country) | 4b DATE OBTAINED | 5. FILE TITLE |
|---|---|---|
| Edinburg, Texas | 07-13-00 | LOZANO-Tijerina, Ruben |

| 6a. REFERRING AGENCY (Name) | 6b. REFERRAL | |
|---|---|---|
| FBI McAllen, Texas | ☐ Case No OR ☐ Seizure No No. | |

| 7. DATE PREPARED | 8. GROUP NO. |
|---|---|
| 07-14-00 | ONE |

| 9. Exhibit No. | 10. FDIN (10 characters) | 11. ALLEGED DRUGS | 12. MARKS OR LABELS (Describe fully) | APPROX. GROSS QUANTITY | | 15. Purchase Cost |
|---|---|---|---|---|---|---|
| | | | | 13. Seized | 14. Submitted | |
| 3A | 2000111643 | Marijuana | Subsample extracted from Exhibit 3 | 80 kilos | 1035 gms | |
| | | | | | | |
| 3B-3K | 2000111643 | Marijuana | 10 subsamples extracted from Exhibit 3 | 80 kilos | 56 gms | |
| | | | | | | |

16. WAS ORIGINAL CONTAINER SUBMITTED SEPARATE FROM DRUG ? ☒ NO (included above)   ☐ YES (if Yes, enter exhibit no. and describe original container fully)

REMARKS:
On 07-13-00, FBI S/A Jorge Velasco released Exhibit 3 to S/A Jack Arnold at the McAllen Distict Office.  On 07-13-00, S/As Jack Arnold and Darby Hodges photographed, marked and processed Exhibit 3 into evidence extracting subsamples 1A-1K.  On 07-14-00, Exhibits 3A-3K were mailed to the DEA South Central Lab via registered mail #R 300 013 633, for analysis.

| 17. SUBMITTED BY SPECIAL AGENT (Signature) | 18. APPROVED BY (Signature & Title) |
|---|---|
| Jack Arnold, S/A   *Jack Arnold* | Lois Delahey, G/S |

**LABORATORY EVIDENCE RECEIPT REPORT**

| 19. NO. PACKAGES | 20. RECEIVED FROM (Signature & Date) | 21. Print or Type NAME and TITLE |
|---|---|---|
| 2 | R 300 013 633 | |
| 22. SEAL ☐ Broken ☒ Unbroken | 23. RECEIVED BY (Signature & Date) *Runnels 2/17/2000* | 24. Print or Type NAME and TITLE  Doralena Runnels, Evid. Tech. |

**LABORATORY REPORT**

25. ANALYSIS SUMMARY AND REMARKS

Exhibit 3A-K contains Marijuana
  Gross Wt.:  1086 g
  Net Wt.:   1005 g

GOVERNMENT EXHIBIT
PENGAD-Bayonne, N.J.
A Hach
9C

00 DEC 12 AM 10: 18  RECEIVED

| 26. Exhibit No. | 27. Lab. No. | 28. ACTIVE DRUG INGREDIENT (Established or Common Name) | CONCENTRATION | | | 32. AMT. OF PURE DRUG | 33. RESERVE |
|---|---|---|---|---|---|---|---|
| | | | 29. Strength | 30. Measure | 31 Unit | | |
| 3A-K | 140003 | Marijuana | N/A | | | | 1002 g |
| | | | | | | | |
| | | | | | | | |

| 34. ANALYST (Signature) | 35. TITLE | 36. DATE COMPLETED |
|---|---|---|
| J. B. Iwamoto | Forensic Chemist | 12-4-00 |
| 37. APPROVED BY (Signature & Date) | 38. TITLE | 39. LAB. LOCATION |
| Darrell L. Davis | Laboratory Director | Dallas, Texas |

DEA Form - 7
(Sept 1995)

Previous edition dated 4/90 may be used until stock is exhausted

1 - Prosecution

PC 3617    37    140001

**U.S. Department of Justice**
**Drug Enforcement Administration**

Read Instructions on Reverse before completing

**REPORT OF DRUG PROPERTY COLLECTED, PURCHASED OR SEIZED**

| 1 HOW OBTAINED (Check) | | 2a. FILE NO. | 2b. PROGRAM CODE | 3. G-DEP ID |
|---|---|---|---|---|
| ☐ Purchase  ☒ Seizure  ☐ Free Sample ☐ Lab Seizure  ☐ Money Flashed  ☐ Compliance Sample (Non-Criminal) ☐ Internal Body Carry  ☐ Other (Specify) | | M5-99-0134 | OCDETF | XNC1I |

| 4a. WHERE OBTAINED (City, State/Country) Edinburg, Texas | 4b. DATE OBTAINED 06-14-00 | 5. FILE TITLE LOZANO-Tijerina, Ruben |
|---|---|---|
| 6a. REFERRING AGENCY (Name) FBI McAllen, Texas | 6b. REFERRAL ☐ Case No  OR  ☐ Seizure No No. | |
| | 7. DATE PREPARED 07-14-00 | 8. GROUP NO. ONE |

| 9. Exhibit No. | 10. FDIN (10 characters) | 11. ALLEGED DRUGS | 12. MARKS OR LABELS (Describe fully) | 13. Seized | 14. Submitted | 15. Purchase Cost |
|---|---|---|---|---|---|---|
| 1A | 2000111630 | Marijuana | Subsample extracted from Exhibit 1 | 23.2 kilos | 1065 gms | |
| 1B~1K | 2000111630 | Marijuana | 10 subsamples extracted from Exhibit 1 | 23.2 kilos | 56 gms | |

**16. WAS ORIGINAL CONTAINER SUBMITTED SEPARATE FROM DRUG ?**  ☒ NO (included above)  ☐ YES (if Yes, enter exhibit no. and describe original container fully)

REMARKS:
On 06-14-00, FBI S/A Jorge Velasco released custody of Exhibit 1 to S/A Jack Arnold at the McAllen District Office.  On 07-13-00, S/As Jack Arnold and Darby Hodges photographed, marked and processed Exhibit 1 into evidence extracting subsamples 1A-1K.  On 07-14-00, Exhibits 1A-1K were mailed to the DEA South Central Lab via registered mail #R 300 013 635, for analysis.

| 17. SUBMITTED BY SPECIAL AGENT (Signature) Jack Arnold, S/A | 18. APPROVED BY (Signature & Title) Lois Delaney, G/S |
|---|---|

**LABORATORY EVIDENCE RECEIPT REPORT**

| 19. NO. PACKAGES 2 | 20. RECEIVED FROM (Signature & Date) R300013635 | 21. Print or Type NAME and TITLE |
|---|---|---|
| 22. SEAL ☐ Broken  ☒ Unbroken | 23. RECEIVED BY (Signature & Date) Runnels 7/17/2000 | 24. Print or Type NAME and TITLE Doralena Runnels, Evid. Tech. |

**LABORATORY REPORT**

**25. ANALYSIS SUMMARY AND REMARKS**

Exhibit 1A-K contains Marijuana
  Gross Wt.:  1137 g
  Net Wt.:   954.6 g

GOVERNMENT EXHIBIT
Attach
9c

| 26. Exhibit No. | 27. Lab. No. | 28. ACTIVE DRUG INGREDIENT (Established or Common Name) | 29 Strength | 30. Measure | 31. Unit | 32. AMT. OF PURE DRUG | 33. RESERVE |
|---|---|---|---|---|---|---|---|
| 1A-K | 140001 | Marijuana | N/A | | | | 951.1 g |

| 34. ANALYST (Signature) J. B. Iwamoto | 35. TITLE Forensic Chemist | 36. DATE COMPLETED 12-5-00 |
|---|---|---|
| 37. APPROVED BY (Signature & Date) Darrell L. Davis | 38. TITLE Laboratory Direcot | 39. LAB. LOCATION Dallas, Texas |

DEA Form - 7
(Sept. 1995)

Previous edition dated 4/90 may be used until stock is exhausted

1 - Prosecution

P6 5618   940002

**U.S. Department of Justice**
**Drug Enforcement Administration**

Read Instructions on Reverse
before completing

**REPORT OF DRUG PROPERTY COLLECTED, PURCHASED OR SEIZED**

| 1. HOW OBTAINED (Check) | | 2a. FILE NO. | 2b. PROGRAM CODE | 3. G-DEP ID |
|---|---|---|---|---|
| ☐ Purchase  ☒ Seizure  ☐ Free Sample<br>☐ Lab. Seizure  ☐ Money Flashed  ☐ Compliance Sample (Non-Criminal)<br>☐ Internal Body Carry  ☐ Other (Specify) | | M5-99-0134 | OCDETF | XNC1I |

| 4a. WHERE OBTAINED (City, State/Country) | 4b. DATE OBTAINED | 5. FILE TITLE |
|---|---|---|
| Edinburg, Texas | 07-11-00 | LOZANO-Tijerina, Ruben |

| 6a. REFERRING AGENCY (Name) | 6b. REFERRAL | |
|---|---|---|
| FBI McAllen, Texas | ☐ Case No OR  ☐ Seizure No<br>No. | |

| 7. DATE PREPARED | 8. GROUP NO. |
|---|---|
| 07-14-00 | ONE |

| 9. Exhibit No. | 10. FDIN (10 characters) | 11. ALLEGED DRUGS | 12. MARKS OR LABELS (Describe fully) | 13. Seized | 14. Submitted | 15. Purchase Cost |
|---|---|---|---|---|---|---|
| 2A | 2000111627 | Marijuana | Subsample extracted from Exhibit 2 | 546 kilos | 784 gms | |
| 2B-2K | 2000111627 | Marijuana | 10 subsamples extracted from Exhibit 2 | 546 kilos | 60 gms | |

16. WAS ORIGINAL CONTAINER SUBMITTED SEPARATE FROM DRUG ?  ☒ NO (included above)   ☐ YES (if Yes, enter exhibit no. and describe original container fully)

REMARKS:
On 07-11-00, FBI S/A Jorge Velasco released custody of Exhibit 2 to S/A Jack Arnold at the McAllen District Office. On 07-13-00, S/As Jack Arnold and Darby Hodges photographed, marked and processed Exhibit 2 into evidence extracting subsamples 2A-2K. On 07-14-00, Exhibits 2A-2K were mailed to the DEA South Central Laboratory via registered mail #R 300 013 634, for analysis.

| 17. SUBMITTED BY SPECIAL AGENT (Signature) | 18. APPROVED BY (Signature & Title) |
|---|---|
| Jack Arnold, S/A | Lois Delaney, G/S |

**LABORATORY EVIDENCE RECEIPT REPORT**

| 19. NO. PACKAGES | 20. RECEIVED FROM (Signature & Date) | 21. Print or Type NAME and TITLE |
|---|---|---|
| 2 | R 300013634 | |

| 22. SEAL | 23. RECEIVED BY (Signature & Date) | 24. Print or Type NAME and TITLE |
|---|---|---|
| ☐ Broken  ☒ Unbroken | X Runnels 7/17/2000 | Doralena Runnels, Evid. Tech |

**LABORATORY REPORT**

25. ANALYSIS SUMMARY AND REMARKS

Exhibit 2A-K contains Marijuana
   Gross Wt.: 839.4 g
   Net Wt.:  775.0 g

GOVERNMENT EXHIBIT
Attach
9c
PBG/AD-Bayonne, N.J.

| 26. Exhibit No. | 27. Lab. No. | 28. ACTIVE DRUG INGREDIENT (Established or Common Name) | 29. Strength | 30. Measure | 31. Unit | 32. AMT. OF PURE DRUG | 33. RESERVE |
|---|---|---|---|---|---|---|---|
| | | | CONCENTRATION | | | | |
| 2A-K | 140002 | Marijuana | N/A | | | | 770.7 g |

| 34. ANALYST (Signature) | 35. TITLE | 36. DATE COMPLETED |
|---|---|---|
| J. B. Iwamoto | Forensic Chemist | 12-4-00 |

| 37. APPROVED BY (Signature & Date) | 38. TITLE | 39. LAB. LOCATION |
|---|---|---|
| Darrell L. Davis | Laboratory Director | Dallas, Texas |

DEA Form - 7
(Sept 1995)

Previous edition dated 4/90 may be used until stock is exhausted

1 - Prosecution